989 P.2d 240 (1999)
The PEOPLE of the State of Colorado, In the Interest of R.W. and T.W., Children, Upon the Petition of the El Paso Department of Human Services, Petitioner-Appellee,
and Concerning L.L., Respondent-Appellant.
No. 98CA1124.
Colorado Court of Appeals, Div. II.
September 2, 1999.
Certiorari Granted November 29, 1999.
Karla J. Hansen, Guardian Ad Litem.
No Appearance for Petitioner-Appellee.
Davide C. Migliaccio, Colorado Springs, Colorado, for Respondent-Appellant.
Opinion by Judge PLANK.
In this dependency and neglect proceeding, L.L. (mother) appeals an order granting legal custody of R.W. and T.W. (children) to the Department of Human Services (DHS), granting guardianship of the children to their foster parents, and denying mother parenting time indefinitely. We affirm.
After dissolution of the marriage between mother and the children's father (father), *241 mother had sole custody and father had certain parenting time, although he seldom used it. DHS initially became involved with the children when mother was convicted of a drug-related offense and sentenced to a brief period of incarceration in 1994. DHS initiated these proceedings by issuing a Notice of Temporary Custody Hearing, and, on February 15, 1994, the children were placed in the temporary custody of their grandmother. At that time, R.W. was nine years old and T.W. was four.
Upon her release from prison, mother sought to end the temporary custody arrangement. However, because of concerns that she might not be able adequately to provide for the children's safety, particularly in light of threats from father and certain prior incidents, the temporary custody arrangement was continued and a restraining order was issued against father.
At subsequent hearings, evidence was presented that mother and grandmother were not adequately caring for the children. In particular, there was testimony regarding an incident in which grandmother permitted mother to take the children to mother's home while mother was under the influence of multiple illegal drugs, and had "needle tracks" on her arms. A petition in dependency and neglect was filed in February 1995.
On June 26, 1995, the juvenile court ordered that the children be placed in foster care, with supervised visitation for mother and grandmother, and ordered mother and grandmother not to disparage each other or the foster parents and not to discuss the court proceedings with the children.
At subsequent hearings, evidence was presented that the children responded well in the foster care environment; that the children were upset, "acted out," and were generally difficult to manage after each visit with their mother and, to a lesser extent, with their grandmother; that mother and grandmother had arranged for visitation with inadequate supervision; that, in direct violation of the court's orders, mother continued to promise the children they would soon return home with her and disparaged the foster parents, made false accusations of abuse, and could not work effectively with them in the best interests of the children; that mother contradicted the foster parents' reasonable instructions to the children (e.g., by telling T.W. not to take her prescription medication and to flush it down the toilet); that mother and father were not complying with their treatment plans, including failure to complete drug and alcohol treatment programs successfully; that father had been incarcerated for approximately 18 months and continued to have little involvement with the children; that mother was incarcerated for 7 months on convictions for shoplifting and driving under the influence of alcohol or drugs; that mother was subsequently incarcerated again for approximately 7 months on drug-related charges; and that these and other circumstances were significantly detrimental to the particular needs of these children. Relations between mother and grandmother deteriorated as each sought to gain custody of the children.
On September 10, 1996, DHS petitioned the court to grant permanent guardianship of the children to the foster parents. The permanency planning hearing was originally set for October 4, 1996, approximately 31 months after the initial placement of the children out of mother's home and about 16 months after the children were first placed in foster care. The permanency planning hearing and guardianship hearings were then combined and subsequently continued several times at the request of grandmother, mother, and father, in each instance so that custody hearings could be held to consider less restrictive alternatives. As noted above, mother was incarcerated during some of this period and, at least at those times, supported grandmother's requests to be granted custody.
The permanency planning hearing was conducted on April 28, 1997. At the hearing, the juvenile court determined that there was no substantial probability that the children could be returned to mother within six months, and their placement in foster care was continued.
In December 1997, DHS filed a motion to terminate the parental rights of mother and father. Although a court-ordered mediation did not produce a resolution satisfactory to *242 all the parties, DHS thereafter sought only permanent guardianship for the children.
At a hearing in February 1998, father stipulated to the permanent guardianship with no visitation, and he does not appeal the juvenile court's order. After a trial in March 1998, the court found that visitation with mother and grandmother was interfering with the children's need for permanency, stability, and consistency and that it was in the best interests of the children for the foster parents to be their permanent guardians and for mother and grandmother to have no visitation or contact with the children.
The juvenile court accordingly ordered:
That custody of [the children] shall continue with [DHS];
That the foster parents are hereby appointed as permanent legal guardians of [the children];
That as permanent guardians, said custodians have:
a) The authority to consent to marriage, to enlistment in the armed forces and to medical and surgical treatment;
b) The authority to represent the children in legal actions and to make other decisions of substantial significance concerning said children;
c) The rights and responsibility of legal and physical custody when such custody has not been vested in another person, agency, or institution;
That [mother] and [grandmother] are to have no contact with the subject children; That there shall be one termination visit between said parties and the subject children;

....
That this matter is continued to June 5, 1998, for written review; [and]
That the Court shall retain jurisdiction herein as provided by law....
Mother now appeals that order.

I.
Mother first contends that, because the juvenile court failed to hold the permanency planning hearing within 18 months after the out-of-home placement of the children as required by statute, it lacked subject matter jurisdiction and its order cannot stand. We disagree.
As pertinent here, Colo. Sess. Laws 1994, ch. 329, § 19-3-702(1) at 2057, states:
In order to provide stable permanent homes for children in as short a time as possible, a court on its own motion or upon motion brought by any party shall conduct a permanency planning hearing if a child cannot be returned home ... for the purpose of making a determination regarding the future status of the child. Such permanency planning hearing shall be held as soon as possible following the dispositional hearing, but shall be held no later than eighteen months after the original placement and from time to time as deemed necessary by the court .... (emphasis added)
It is not disputed that the permanency planning hearing did not occur within eighteen months after the children were first placed out of mother's home.
Because mother did not raise this issue in the juvenile court and did not object to the late setting and subsequent continuances of the hearing, we would not ordinarily consider this issue raised for the first time on appeal. See People in Interest of V.W., 958 P.2d 1132 (Colo.App.1998). However, to the extent mother contends that the juvenile court's failure to follow mandatory statutory language deprived the court of subject matter jurisdiction to enter the order at issue, that question can be first raised at any stage of the proceedings, including on appeal. See In re Marriage of Akins, 932 P.2d 863 (Colo. App.1997).
The Children's Code is intended, among other purposes, to secure for all children such care and guidance as will serve their best interests and those of society; to secure for each child such care and guidance, preferably in his or her own home, as will best serve the child's welfare; to preserve and strengthen family ties whenever possible; and to ensure that children who must be removed from their homes will become responsible *243 and productive adults. Section 19-1-102(1), C.R.S.1998. To those ends, the Children's Code is to be liberally construed "to serve the welfare of children and the best interests of society." Section 19-1-102(2), C.R.S.1998.
Accordingly, we must promote the spirit and purposes of the Children's Code, and those purposes would not be served by adopting the rigid view that the time limits contained therein are jurisdictional. See P.F.M. v. District Court, 184 Colo. 393, 520 P.2d 742 (1974) (failure to hold mandatory juvenile detention hearing within 48 hours not jurisdictional); People in Interest of S.B., 742 P.2d 935 (Colo.App.1987) (failure to hold mandatory juvenile adjudicatory hearing within 90 days not jurisdictional).
This case provides a clear example of why that is so. Virtually all of the delay in holding the permanency planning hearing was the result of efforts by the court and the parties to find a disposition that would both serve the best interests of the children and also permit them to remain in the care and custody of mother, father, or grandmother. Although those efforts were ultimately unsuccessful, we are persuaded that they were appropriate under the circumstances and furthered the express legislative intent of the Children's Code.
Thus, we hold that the juvenile court did not lack subject matter jurisdiction to enter the order at issue here after a permanency planning hearing that was conducted beyond the eighteen-month time limit.

II.
Mother next contends that the juvenile court violated her right to due process by entering an order that is functionally equivalent to a termination of her parental rights without complying with the applicable burden of proof. We disagree.
Once a child has been adjudicated dependent and neglected, the juvenile court must fashion an appropriate remedy from a variety of available dispositions. Section 19-3-508, C.R.S.1998.
A judgment terminating parental rights is the most drastic such disposition because it permanently and completely eliminates all parental rights and duties, including residual rights and responsibilities. Sections 19-1-103(107) and 19-3-608(1), C.R.S.1998.
Parental rights may be terminated only if, as pertinent here, the parent is unfit and no appropriate treatment plan can correct that unfitness, or the parent has failed to comply with an appropriate treatment plan, is unfit, and the situation is unlikely to change within a reasonable time. Section 19-3-604, C.R.S.1998. The determination that the parent is unfit must be made upon clear and convincing evidence. Section 19-3-604(1), C.R.S.1998; Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (due process requires that a termination of parental rights be based upon clear and convincing evidence of parental unfitness).
Mother argues that the juvenile court's order is statutorily defective and violates her due process rights because the determination that she was unfit was not based upon clear and convincing evidence. We are not persuaded.
At a hearing to determine an appropriate disposition in a dependency and neglect proceeding, other than a termination of parental rights, the appropriate standard is the best interests of the child and the applicable burden of proof is a preponderance of the evidence. See § 19-3-508(2), C.R.S.1998.
The juvenile court did not articulate the burden of proof it employed for the hearing at which it found, with support in the record, that mother had not complied with her treatment plan; that the children were being harmed by continued visitation with mother and grandmother; and that the children needed consistency, proper parenting, and stability. In the absence of anything in the record to the contrary, we assume the juvenile court made these findings based upon the preponderance of the evidence.
As the above quoted order reveals, the trial court determined that DHS would retain legal custody of the children, appointed the foster parents as their permanent legal guardians, directed that there be no further *244 contact between the children and mother, and retained continuing jurisdiction over the matter as provided by law.
Contrary to mother's contention, a guardian has only the authority to make certain "major decisions" affecting a child. Section 19-1-103(60), C.R.S.1998. Thus, as mother acknowledged at trial, after an order granting custody or guardianship of a child to another individual or entity, the parent retains various rights, including but not limited to the right to consent, or to withhold consent, to the child's adoption, the right to reasonable parenting time except as restricted by the court, and the right to determine the child's religious affiliation. Section 19-1-103(93), C.R.S.1998. Most important here, unless parental rights are terminated, the juvenile court retains continuing jurisdiction over the custody of the child, and thus, until the child reaches majority, the parent retains the right to seek a modification of the disposition in order to regain custody and to obtain increased parenting time, or to request other relief. Section 19-3-205, C.R.S.1998.
The record supports the juvenile court's finding that continued involvement with mother and grandmother, under the present circumstances, was contrary to the best interests of the children. Mother requested, DHS agreed, and the juvenile court ordered, that mother be kept informed of major events in the children's lives. The record reflects that the juvenile court continued to hold periodic reviews of the case after entry of the guardianship and visitation order.
Consequently, we conclude that the juvenile court's order is not the functional equivalent of a termination of mother's parental rights, but rather reflects a careful consideration of the children's present needs while leaving open the possibility of the mother's increased involvement with the children in the future.
The order is affirmed.
Judge KAPELKE concurs.
Judge CRISWELL dissents.
Judge CRISWELL dissenting.
While I agree with the majority's interpretation of the permanency planning statute, I am convinced that the court could not, consistent with the principles of procedural due process, enter the type of order at issue, unless its underlying factual findings were based upon a clear and convincing standard of proof. Because it appears that the trial court applied a mere preponderance of the evidence standard, I would vacate its order and remand the cause for its reconsideration under the proper standard.
As the majority opinion reflects, the trial court's order here appointed the children's foster parents as their "permanent guardians." As such, those guardians were given the right and responsibility to make virtually all of the major life decisions for the children, to the exclusion of mother's wishes or desires. The only decisions that mother can participate in will be to decide the children's religious affiliation and to determine whether she should consent to their adoption. And, this responsibility will continue on an indefinite, "permanent" basis. While I do not denigrate the importance of the first decision, the retention of the right not to consent to the children's adoption is, in my view, substantially meaningless under the circumstances.
Further, the removal of virtually all of mother's parental rights with respect to the decision-making aspect of her children's lives is to be accompanied by a total lack of contact (save for one, final, "termination visit") between mother and her children. Indeed, mother's only chance of ever seeing her children again during their minority will be if, during some future review proceeding, she assumes the burden of proving that either she or conditions have undergone a substantial change so that visits with the children will be in their interest.
Mother asserts that the court's order placing such severe and indefinite restrictions upon her parental rights constitutes the functional equivalent of an order terminating those rights. In contrast, the majority says that she still retains some vestige of parental rights, so that the court's order was not like a termination order.
*245 In my view, however, the resolution of this issue is not determinative of the question of procedural due process that is presented here.
In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Supreme Court noted that there are several types of proceedings, such as civil commitments, deportations, and denaturalizations in which the individual interests at stake are particularly important and which are more substantial than a mere loss of money. In such proceedings, therefore, the government is required to assume an enhanced burden of proof so as to preserve the fundamental fairness of the proceedings. Applying the threecriteria analysis of Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Santosky court concluded that proceedings that could lead to a termination of the parent-child relationship also involved such an important private interest that due process required the state to assume the enhanced burden of proving justification for such termination by clear and convincing evidence.
In my view, whether or not the court order here can be said to be the "functional equivalent" of a termination order, its effect is so restrictive of parental rights that it cannot pass constitutional muster unless it is premised on facts proved under an enhanced standard.
It may well be that the evidence presented by the state here would meet such a standard. However, because the record does not demonstrate that the court applied that standard before entering its order, I would vacate that order and remand the cause with directions for the court to reconsider the issues presented and to test the evidence by the clear and convincing standard.