**L.L., Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent,**

**In the Interest of R.W. and T.W,**

**and**

**R.B. and B.S., Interested Parties Below.**

**No. 99SC799.**

Supreme Court of Colorado, En Banc.

Sept. 18, 2000.

---

Davide C. Migliaccio, Colorado Springs, Colorado, Attorney for Petitioner.

Michael A. Lucas, office of the El Paso County Attorney, Johnny Bohnen, El Paso County Department of Human Services,, Colorado Springs, Colorado Attorneys for Respondent.

Justice RICE delivered the Opinion of the Court.

This court granted certiorari to address whether the court of appeals erred when it affirmed the trial court and held that a parent's due process rights are not violated when the majority of her parental rights, including the right to custody and visitation, are suspended until her children are eighteen years of age, pursuant to findings of fact made under a preponderance of the evidence standard. *People in Interest of R.W. and T.W.*, 989 P.2d 240 (Colo.App.1999)(Criswell, J., dissenting)(hereinafter *R.W. and T.W.*). We affirm the court of appeals and hold that Petitioner's due process rights were not violated when the trial court significantly limit-ed her parental rights in a guardianship hearing based on findings of fact under a preponderance of the evidence standard.

## I. Facts and Procedural History

In 1994, Petitioner was convicted of a drug-related offense and sentenced to a brief period of incarceration. The El Paso County Department of Human Services ("DHS") issued a Notice of Temporary Custody Hearing and on February 2, 1994, the district court placed Petitioner's two children, R.W. and T.W., in the temporary custody of their maternal grandmother ("Grandmother"). The father of both children ("Father") was incarcerated at the time. R.W. was nine years old and T.W. was four.

Upon release from prison, Petitioner sought to end the temporary custody arrangement and DHS recommended that the custody of the children be returned to Petitioner. On January 30, 1995, the court ordered temporary custody to be shared by both Petitioner and Grandmother.

In February 1995, DHS filed a petition in dependency and neglect based on a belief that neither Petitioner nor Grandmother was adequately caring for the children. At a hearing on the petition, DHS presented evidence that Grandmother allegedly permitted Petitioner to take the children to her home while she was under the influence of various illegal drugs. The district court placed the children in the legal and physical custody of DHS, granting Petitioner and Grandmother supervised visitation only.

On April 19, 1995, the court placed custody of the children with Grandmother, with DHS exercising protective supervision. On June 22, 1995, the court revoked Grandmother's custody due to her failure to follow court orders, and the children were again placed in the legal and physical custody of DHS. The court ordered that the children be placed in foster care, granted Petitioner and Grandmother supervised visitation, and ordered Petitioner and Grandmother to refrain from disparaging each other or the foster parents to the children, and to refrain from discussing court proceedings with the children. On August 24, 1995, the court adjudicated the

children dependent and neglected, adopted a proposed treatment plan, and continued custody of the children with DHS.

On September 10, 1996, DHS petitioned the court to grant permanent guardianship of the children to the foster parents. The court scheduled the permanency planning and guardianship hearings for October 4, 1996, but continued the hearings several times at the request of Petitioner, Father, and Grandmother.

On April 28, 1997, the court held a permanency planning hearing, determined that there was no substantial probability that the children could be returned to Petitioner within six months, and continued foster care placement.

On December 16, 1997, DHS filed a motion to terminate the parent-child legal relationship of Petitioner and Father. *See* § 19-3-602, 6 C.R.S. (1999). On February 18, 1998, the court ordered mediation, but the parties could not reach a resolution. However, DHS subsequently decided to seek only permanent guardianship of the children, rather than termination of the parent-child legal relationship.

On March 4, 1998, the court held a hearing on permanent guardianship. Father consented to permanent guardianship being placed in the foster parents, with no visitation rights, but Petitioner opposed both the entry of permanent guardianship and the proposed no contact order. The court found that the children needed ongoing treatment, that they were being harmed by the continued contact with Petitioner and Grandmother, that they needed stability and permanency, and that it was in the children's best interests to be placed in the permanent guardianship of the foster parents. Accordingly, the court ordered:

> That custody of the subject children shall continue with [DHS];
>
> That the foster parents are hereby appointed as permanent legal guardians of the subject children;

That as permanent guardians, said custodians have:

> a) The authority to consent to marriage, to enlistment in the armed forces and to medical and surgical treatment;
>
> b) The authority to represent the children in legal actions and to make other decisions of substantial significance concerning said children;
>
> c) The rights and responsibility [sic] of legal and physical custody when such custody has not been vested in another person, agency, or institution;
>
> That [Respondent] and [Grandmother] are to have no contact with the subject children;
>
> That there shall be one termination visit between said parties and the subject children;
>
> . . . .
>
> That this matter is continued to June 5, 1998, for written review; [and]
>
> That the Court shall retain jurisdiction herein as provided by law . . . .

(R. at 454—56).

Petitioner appealed to the court of appeals, asserting that the trial court violated her due process rights when it ordered the functional equivalent of a termination of her parental rights without applying the "clear and convincing evidence" standard of proof. The court of appeals affirmed the district court order. In a divided panel, the court found that the district court order did not act as the functional equivalent of a termination of Petitioner's parental rights.[1] *R.W. and T.W.*, 989 P.2d at 244. The majority stated that Petitioner still retains various rights, including the right to consent or withhold consent to the children's adoption, the right to determine the children's religious affiliation, the right to reasonable parenting time, except as restricted by a court,[2] and the right to seek a modification of the disposition in order to regain custody and increase parenting time. *Id.* The court of appeals concluded that the district court order "reflects a care-

---

1. The majority noted that, although not articulated by the district court, it appeared that the standard of proof applied was a preponderance of the evidence. *R.W. and T.W.*, 989 P.2d at 243.

2. In this case, Petitioner has no parenting time due to a no-contact order.

ful consideration of the children's present needs while leaving open the possibility of the mother's increased involvement with the children in the future." *Id.* The dissent disagreed with the majority opinion, arguing that the effect of the district order was "so restrictive of [Petitioner's] parental rights that it cannot pass constitutional muster unless it is premised on facts proved under an enhanced standard." *Id.* at 245.

Petitioner filed a petition for a writ of certiorari, arguing that the district court violated her due process rights when it drastically restricted her parental rights based on findings obtained under a preponderance of the evidence standard. We granted certiorari to address whether the trial court's order deprived Petitioner of due process by drastically restricting her parental rights based on findings obtained under a preponderance of the evidence standard.

## II. Dependency and Neglect Proceedings

Article 3 of the Colorado Children's Code, titled "Dependency and Neglect," provides specific provisions whereby the state can intercede to protect the health, safety, and welfare of minors from abuse, neglect, or abandonment. In particular, Article 3 governs child abuse and neglect proceedings, temporary custody and shelter of minors, and termination of the parent-child legal relationship. *See* § 19–3–100.5 to 703, 6 C.R.S. (1999). The Article states in its legislative declaration that "the stability and preservation of the families of this state and the safety and protection of children are matters of statewide concern," and to that end, that the state shall "make a commitment to make 'reasonable efforts' to prevent the placement of abused and neglected children out of the home and to reunify the family whenever appropriate." § 19–3–100.5(1). To that end, the Children's Code encompasses a number of procedures aimed at protecting children

from emotional and physical harm while at the same time seeking to repair and maintain family ties.

 Often, the process begins with a report of abuse or neglect.[3] The state may file a petition alleging that a child is dependent or neglected under section 19–3–501.[4] An adjudicatory hearing is then held, where the state must establish by a preponderance of the evidence that a child is dependent or neglected. *See* § 19–3–505(1). Once the court determines a child is dependent or neglected, the court has the authority to order a variety of dispositions, including: placement of legal custody in the parents or guardian, with or without protective supervision; placement of legal custody in a relative, with or without protective supervision; placement of legal custody in the county department of social services, a foster home, or other child care facility; and mental and physical examinations of a child. *See* § 19–3–508. In addition, the court must approve a treatment plan that seeks to resolve family difficulties and preserve the family unit. *See* § 19–3–508(1)(e)(I). However, when a court determines that the goal of maintaining the family unit is not feasible, for any of the reasons listed in section 19–3–604, the court may order termination of the parent-child relationship after the filing of a motion for termination.[5]

## III. Constitutional Significance

 The United States Supreme Court has recognized that parents possess a right to the "companionship, care, custody, and management" of their children, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and a fundamental right to maintain family relationships free from governmental interference. *See generally id.* Very recently, the Court reiterated this position, noting that "the interest of parents in

3. In the case at hand, Petitioner's children initially were placed in the temporary custody of their grandmother when Petitioner was incarcerated for a drug-related offense.

4. The Children's Code also provides a number of remedies aimed at protecting a child from an immediately dangerous situation, such as temporary shelter, *see* § 19–3–404, temporary protec-

tive custody, *see* § 19–3–405, and restraining orders, *see* § 19–3–316, all aimed at providing a temporary remedy.

5. Termination of the parent-child relationship will only be considered after a proper motion for termination has been filed. *See* § 19–3–602(1).

the care, custody, and control of their children——is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). As such, the government must meet certain due process and equal protection standards before these constitutional rights can be extinguished. Logically, the greater the deprivation, the greater the procedural protection provided to parents.

■ When a permanent termination of parental rights is sought, a parent's rights must be protected "with fundamentally fair procedures." *Santosky v. Kramer,* 455 U.S. 745, 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Applying the three-prong test articulated in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court concluded that due process mandated a higher standard of proof than a preponderance of the evidence standard when parental rights were being permanently terminated. In holding that the minimum standard of proof required in a parental rights termination proceeding is clear and convincing evidence, the Court stated that the private interest affected is commanding, the risk of error from using a preponderance of the evidence standard is substantial, and the countervailing governmental interest favoring that standard is comparatively slight. *See Santosky,* 455 U.S. at 758, 769—70, 102 S.Ct. 1388. The court noted that the standard of proof necessary turns in large part on both the nature of the threatened private interest and the permanency of the threatened loss. *See id.* at 758, 102 S.Ct. 1388.

This court, in the same year, applied the *Santosky* standard to termination proceedings in Colorado. *See People in Interest of A.M.D.,* 648 P.2d 625 (Colo.1982). We held that the clear and convincing evidence standard mandated by *Santosky* was adequate to protect the rights of the natural parent in termination proceedings.[6] *See id.* at 635.

In addition, this court addressed the issue of whether the preponderance of the evidence standard that applies during a dependency or neglect proceeding was sufficient to protect a parent's due process rights even though an adverse finding in that hearing could be the basis of a subsequent termination of parental rights. *See* § 19–3–604(1)(b). After applying the three-prong test of *Mathews,* we concluded that this standard was appropriate and constitutional. The court noted that the governmental interests reflected in the Children's Code are more extensive and weighty than those present in the *Santosky* case. In particular, we noted that prior to filing a petition in dependency or neglect, the state has limited authority to take action to protect a child. *See A.M.D.* 648 P.2d at 639. In addition, the court pointed out that a dependency or neglect proceeding is remedial in nature and the purpose is to preserve the family unit and assist parents and children in establishing a healthy relationship and home environment. *See id.* at 640. The court stated, "[w]hen a dependency or neglect proceeding is viewed in light of its primary purpose—— as helpful and remedial in preserving and mending familial ties——the importance of permitting State intervention on a standard of proof lower than clear and convincing becomes evident." *Id.* Accordingly, we held that while a standard of clear and convincing evidence is constitutionally mandated in a proceeding for terminating the parent-child relationship, a standard of a preponderance of the evidence is sufficient for dependency and neglect proceedings. *See id.* at 641.

## IV. Application

■ Petitioner raises the question of what standard of proof is required by due process when a parent is deprived of significant parental rights that do not amount to a permanent termination of the parent-child relationship. Petitioner asserts that the district court order, which granted custody of her children to DHS, appointed the foster parents as "permanent" legal guardians, and ordered that she have no contact with her children until they were over eighteen years old, other than one "termination visit," was the functional equivalent of the termination of her parental rights. Accordingly, she argues that the decision should have been gov-

---

**6.** This burden of proof is codified in section 19–3–604(1).

erned by a clear and convincing evidence standard.

◼ At a hearing to determine an appropriate disposition in a dependency or neglect proceeding, the state must show that "by a preponderance of the evidence ... a separation of the child from the parents or guardian is in the best interests of the child." § 19–3–508(2). Although the trial court never articulated the burden of proof, the court of appeals found, and we agree, that there is nothing in the record to suggest that the trial court did not employ this standard. *R.W. and T.W.*, 989 P.2d at 243.

Although DHS did not seek to terminate Petitioner's parental rights pursuant to sections 19–3–601 to 611, Petitioner is losing the majority of her parenting rights, including the right to the custody, care, and companionship of her children. As the trial court order indicates, the foster parents, as permanent legal guardians, are conferred the authority to consent to marriage, to enlistment in the armed forces, and to medical or surgical treatment. They have the authority to represent the children in legal actions, and they have all the "rights and responsibility [sic] of legal and physical custody."

However, despite the fact that Petitioner is losing many of her parental rights, this custody order differs significantly from a total termination of parental rights. First, the trial court retains jurisdiction over the case until the children are twenty-one years old. *See* § 19–3–205. This means that Petitioner may petition to seek a modification of the disposition to regain custody or increase parenting time. In fact, the trial court, in its order limiting Petitioner's custody and visitation rights, continued the case until June 5, 1998, to reevaluate the case then.

In addition, although she loses many of her rights under this order, Petitioner, as the parent of her minor children, retains the right to consent or withhold consent to adoption, the right to reasonable parenting time except as restricted by the court,[7] and the right to determine the children's religious affiliation. *See* § 19–1–103(93).

◼ We recognize that there is some tension between the appearance of finality in such orders and the continuing jurisdiction of the juvenile court to address the mother's right to petition for modification. However, the "permanency" and "finality" of the order herein would yield to any modifications that are subsequently made by the court as a result of substantial changes in circumstances. Because guardianship orders are merely a plan for permanency that is subject to change as warranted by the best interests of the children, Petitioner's residual right to petition for modification is sufficient to refute the argument that this guardianship order was the functional equivalent of termination.

◼ Accordingly, we reiterate here our holding in *A.M.D.* that due process of law is accorded to parties when an adjudicatory hearing of a dependency or neglect proceeding is governed by a preponderance of the evidence standard. Although Petitioner is suffering the loss of many of her parental rights, this fact does not change our analysis of the constitutionality of dependency or neglect proceedings under the *Mathews v. Eldridge* three-prong test. As we noted in *A.M.D.*, the governmental interest here is significant. *See A.M.D.*, 648 P.2d at 639. The adjudication of dependency or neglect petitions provide the state with the means to intervene to assist parents and children in establishing a home environment that will preserve the family unit. The purpose of dependency or neglect proceedings is not to deprive parents of their rights to raise their children; rather, it is to preserve the family and protect children.

◼ Similarly, we reiterate our concern that "[t]he effect of heightening the standard of proof at the adjudicatory stage could be pernicious." *Id.* at 640. The preponderance of the evidence standard in dependency or neglect proceedings permits the state to take the proper role as an intervenor, a role that corresponds with the legislative intent of the Children's Code "[t]o secure for each child subject to [its] provisions such care and guidance, preferably in his own home, as will best

---

7. Although Petitioner presently has no parenting time due to a no-contact order, she retains the

right to petition the court to modify that order. *See* § 19–3–205.

serve his welfare and the interests of society; [and t]o preserve and strengthen family ties whenever possible, including improvement of home environment." § 19–1–102(1). Heightening the burden of proof for dependency or neglect proceedings could have the effect of making it more difficult for the state to protect children, lessening the ability of the court and the state to fashion workable solutions, and increasing the risk of an adversarial environment between the state and parents.

Although the trial court order in this case results in the deprivation of many of Petitioner's parental rights, it was a decision reached by the court after more than four years of court and DHS involvement attempting to reconcile the family issues that were contributing to an unsafe and unhealthy environment for these children. Despite many years of effort, neither the court nor DHS believed that the children could be returned safely to Petitioner's custody. However, because DHS sought a permanent custody order, rather than termination of the parent-child relationship, Petitioner retains the right to petition the court for a change in custody status. Because Petitioner is not deprived of all her parental rights, and because the trial court retains jurisdiction to modify its existing order, we hold that the trial court order relating to Petitioner's custody and visitation rights does not violate her constitutional rights to due process.

## V. Conclusion

Accordingly, we affirm the judgment of the court of appeals and hold that Petitioner's due process rights were not violated when the trial court significantly limited her parental rights at a guardianship hearing, held pursuant to a dependency and neglect proceeding, based on findings of fact under a preponderance of the evidence standard.