IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2012

IN RE GINA A.

Appeal from the Circuit Court for Lincoln County
No. C11000231      Franklin L. Russell, Judge

No. M2011-00956-COA-R3-JV - Filed April 19, 2012

Mother argues that the divestment of custody of her child from the Department of Children's
Services to a relative in another state constitutes de facto termination of her parental rights.
We find no merit to this argument since the parent-child relationship was not terminated by
the court's custody decision.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL,
P.J., M.S., and RICHARD H. DINKINS, J., joined.

Trisha A. Bohlen, Bell Buckle, Tennessee, for the appellant, Krissy A.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General;
and Alexander S. Rieger, Assistant Attorney General; for the appellee, State of Tennessee,
Department of Children's Services.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Krissy A. ("Mother") gave birth to Gina A. on January 7, 2010. The Department of
Children's Services ("DCS") received a referral the next day and began an investigation
based upon allegations that Mother had limited intellect and that her two other children had
been removed from her custody due to lack of supervision and physical abuse.[1]

---

[1]The two older children live with permanent guardians in New Mexico and are not at issue in this
case.

On January 15, 2010, DCS filed a petition against Mother and Gina A.'s father[2] requesting that Gina be declared dependent and neglected and that temporary legal custody be awarded to the child's maternal grandmother. After a preliminary hearing on January 20, 2010, the court found probable cause to find the child dependent and neglected and awarded temporary custody to the child's maternal grandmother. A guardian ad litem was appointed for the child, and an attorney was appointed for Mother. The next day, the maternal grandmother informed DCS that she could no longer care for the child. DCS filed another petition requesting the court to award temporary custody to DCS. Attached to this petition and the original petition were DCS's criteria and procedures for termination of parental rights. On January 27, 2010, the court entered a protective custody order awarding temporary custody of the child to DCS. Mother waived a second preliminary hearing, and the court entered an order on February 17, 2010, finding probable cause that Gina was dependent and neglected and awarding temporary custody to DCS.

DCS placed Gina with foster parents. The permanency plan for Gina, dated February 11, 2010, included dual goals of reunification with parent and exiting custody to live with a relative. Mother was responsible for maintaining "regular and positive visitation with Gina." Mother's strengths included being a good housekeeper and keeping her home clean and having stable housing. She was described as "a very good hearted person," "very calm and good natured," and a good cook. With respect to the goal of returning Gina to Mother, a desired outcome was for Mother to be able to properly care for the child. To achieve this outcome, the following actions were needed:

1a) [Mother] will ensure that Gina is on a regular schedule in regards to feeding and sleeping by 2-11-10.

1b) Resource Parents will continue to inform [Mother] about Gina's eating and sleeping routine at their home. [Mother] will keep this routine during visitation. On-going.

1c) DCS will refer [Mother] to HUGS program or a similar program to assist with caring for Gina.

1d) [Mother] will check Gina's diaper frequently to ensure it doesn't need to be changed by 2-11-10.

1e) [Mother] will hold, talk to, and play with Gina to bond with Gina by 2-11-10.

---

[2]Gina A.'s father is not involved in this appeal.

1f) [Mother] will participate in a parenting assessment by 3-11-10. [Mother] will follow all recommendations.

With respect to the desired outcome of meeting all of Gina's needs, Mother was required to contact the child support division to initiate the process for the assignment of child support. Another outcome under the goal of returning Gina to Mother was that Mother's mental health needs be met. To achieve this desired outcome, Mother was required to participate in a mental health intake, sign a release to allow DCS to obtain her counseling records, and follow all recommendations of the mental health intake. The expected achievement date for all of these desired outcomes was May 11, 2010.

At a hearing on April 7, 2010, the court ratified Gina's permanency plan. Mother waived the adjudicatory hearing and consented to a finding that the allegations in the petition were sustained by clear and convincing evidence.[3] The court stated that its order constituted a final determination that Gina was dependent and neglected for the reasons described in the petition and a final disposition awarding custody to DCS.

In May 2010, DCS generated a new permanency plan and placed the child with her maternal aunt, Joyce A., in Texas. Mother was to continue working on the actions described in the previous parenting plan with a new target date of August 11, 2010. She was awaiting a court date with respect to the assignment of child support. This parenting plan states that Mother did not agree with Gina's being placed in Texas. The court ratified this parenting plan on June 16, 2010. In its order, the court found: "The mother did participate in development of the plan and is not in agreement with the plan because she does not agree with placement of the child in Texas pursuant to the ICPC[4] due to inability to continue visitation."

On December 15, 2010, DCS filed a motion for divestment requesting that the court relieve DCS of temporary legal custody and divest legal custody to the maternal aunt, Joyce A., in Texas. According to the motion, the state of Texas had supervised the placement, reported that there were no problems with the placement, and recommended divestment to Joyce A. DCS submitted the affidavit of Carrie Buchanan, case manager, who testified about the status of Gina's case. With respect to Mother's progress on the parenting plan, Ms. Buchanan stated that Mother was attending counseling and parenting at LifeCare, had a

---

[3]Tenn. Code Ann. § 37-1-129(c) requires that a finding of dependency and neglect be based upon clear and convincing evidence.

[4]ICPC refers to the Interstate Compact on the Placement of Children. *See* Tenn. Code Ann. §§ 37-4-201 to -207.

parenting assessment, and participated in the HUGS program. The affidavit gives the dates of Mother's visits with Gina, which occurred between January 28, 2010, through May 20, 2010. Ms. Buchanan further reported:

> FSW Rose reported in many of her recordings that [Mother] needed to be told by others present for the visitation that Gina needed to be fed or her diaper needed to be changed. There were also incidents where [Mother] handed Gina to the foster mother or other relative when Gina cried. It was also documented that during a visitation [Mother] opted not to feed Gina since the resource parents did not pre-mix the formula prior to the visit. It is also documented that [Mother] would look to FSW Anna Rose when Gina became fussy or cried.

The case manager's and the caseworker's contacts with Mother and with the child ended on May 20, 2010. The child moved to Texas on May 25, 2010.

According to an ICPC supervision report from Texas dated December 8, 2010, the maternal aunt reported that Mother had not come to Texas to visit and had mailed one letter since the child had been in her home. Mother had not assisted financially. Mother did talk to the child on the telephone.

The motion for divestment was heard by the juvenile court on February 4, 2011. DCS presented testimony from Ms. Buchanan, who had served as Mother's case manager. She stated that Mother was in substantial compliance with the permanency plan but could not do hands-on care of Gina since the child had been in Texas for the past six months. Ms. Buchanan summarized the efforts made by DCS. She testified that Mother had been consulted several times about the possible move to Texas and agreed to this placement instead of having Gina stay with the foster parents in Tennessee. On cross-examination, Ms. Buchanan stated that the foster parents in Tennessee had expressed a desire to adopt Gina.

DCS then called Dr. William Vaughan, a psychologist, to the stand to testify about his evaluation of Mother in March 2010. Dr. Vaughan performed a clinical interview and administered a battery of tests to Mother. Subtests of the Woodcock-Johnson Tests of Cognitive Abilities showed Mother to be in the intellectually deficient range of cognitive functioning. Scores for verbal ability, verbal comprehension, and concept formation were in the borderline range; and visual matching (a measure of perceptual speed) was in the deficient range. Administration of the Rorschach Ink Blots showed deficits in Mother's ability to cope with everyday experience, especially with respect to social situations. Dr. Vaughan also noted "a severe impairment in [Mother's] reality testing abilities." The Parenting Stress Index showed "clinically significant stressors in the parent-child system."

Elevation on the life stress scale showed that Mother saw herself in "stressful situational circumstances that are beyond her control." Child Abuse Potential Inventory results revealed a significant elevation on the rigidity scale.

Based upon his evaluation, Dr. Vaughan opined that Mother had "limited cognitive, social, and emotional resources for providing for the care and supervision of her 2 month old daughter" and that "significant professional interventions will be needed to prevent dysfunctional parenting and child maltreatment." Dr. Vaughan gave specific recommendations for interventions, including parenting classes, individual counseling, and "practical, hands-on assistance in the application of parenting skills." He further stated that any transition of Gina to Mother's care would require in-home services.

The next DCS witness was Mother, who testified that she attended mental health counseling and parenting classes at LifeCare Family Services. The DCS attorney questioned her extensively about what she had learned in the parenting classes. Mother stated that she had initially agreed with the goal of sending Gina to Texas because she did not want her child to be adopted by the foster parents in Tennessee. Mother felt that she was able to care for Gina now because she had learned about discipline. Mother testified that she had been living in her current apartment for two years. She admitted that she still needed help with respect to parenting. Mother also admitted that she had left New Mexico because she feared that the state would take Gina away from her there.

Mother called Leann Clark, Mother's case manager at LifeCare, as a witness. She testified that Mother had attended her appointments at LifeCare faithfully and had been cooperative. Ms. Clark described Mother's home as "very neat and organized" and stated that the home was clean enough for children to live in. Ms. Clark worked with Mother to reinforce her parenting skills and stated that Mother seemed to know the parenting class materials. When asked whether she would have concerns about Mother caring for a one-year-old, Ms. Clark stated that she could not answer because she had never seen Mother interact with Gina. Ms. Clark testified that Mother had done everything that LifeCare had asked of her. Asked about Mother's mental health diagnosis, Ms. Clark stated that Mother had mild mental retardation and possibly also a depressive disorder. Mother sometimes had trouble processing information.

After the hearing, the court granted DCS's motion to divest custody. DCS was relieved of temporary legal custody, and custody was granted to Joyce A. Mother appealed the juvenile court's decision to the circuit court for a de novo hearing.

The circuit court hearing was held on March 9, 2011. The parties stipulated to the juvenile record, which was presented for the circuit court's consideration. The court also

heard testimony from Mother. In its order approving the divestment of custody to Joyce A., the circuit court stated:

> [T]he Court finds that the Department of Children's Services provided all services and training set out in the permanency plan, except those services which were unable to be performed after the child, [Gina A.], was placed with maternal aunt, [Joyce A.], in Texas through the Interstate Compact on the Placement of Children (ICPC). The child was placed with [Joyce A.] in May 2010. The Court finds that [Mother] testified that she participated in the decision to send the child to Texas with her aunt even though she was aware that it would restrict her interaction with the child and hamper DCS'[s] ability to train her in further parenting skills.
>
> . . . The initial permanency plan had dual goals of Reunification with parent and Exit Custody to Live with Relative. The mother agreed to the plan and assisted with the decision to send the child to Texas to live with her aunt. The mother asserted her agreement with the permanency plan at the Ratification hearing on April 7, 2010 and testified on March 9, 2011 that she knowingly assisted in the decision to place the child in Texas.

The court concluded that divestment to the custody of Joyce A. was in the best interest of Gina A.

STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn.1999). When the trial court has seen and heard witnesses, especially where issues of credibility are involved, we must accord considerable deference to the trial court's findings. *Seals v. England/Corsair Upholstery Mfg. Co, Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995).

ANALYSIS

Mother argues that the divestment of custody to the child's aunt, when Mother was in compliance with the terms of the parenting plan, constitutes de facto termination of Mother's parental rights. We cannot agree.

Dependency and neglect proceedings and proceedings to terminate parental rights have distinct purposes. In a dependency and neglect action, the primary purpose is to "provide for the care and protection of children whose parents are unable or unwilling to do so." *State v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006) (citing *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004)). The purpose of termination proceedings is "to irrevocably sever the legal relationship between parent and child." *Id.*

In this case, the court granted DCS's motion to divest custody to Joyce A., thereby making her Gina's legal custodian. Tenn. Code Ann. § 37-1-130(a)(2)(D) permits a court, after adjudicating a child dependent and neglected,[5] to transfer temporary legal custody or grant permanent guardianship to "[a]n individual in another state with or without supervision" if such a placement is in the child's best interests. The rights and duties of a child's legal custodian remain subject to the remaining rights and duties of the child's parents. *See* Tenn. Code Ann. §§ 37-1-140(a), 37-5-103(12); Tenn. R. Juv. P. 2(10). Pursuant to Tenn. Code Ann. § 37-1-803(a), an order of permanent guardianship "does not terminate the parent and child relationship," including the following rights:

> (1) The rights of the child to inherit from the child's parents;
>
> (2) The parents' right to visit or contact the child, as defined by the court;
>
> (3) The parents' right to consent to the child's adoption; and
>
> (4) The parents' responsibility to provide financial, medical, and other support
> for the child.

Moreover, Mother retains the right to petition to regain custody of Gina.

Courts in other jurisdictions have considered constitutional challenges to statutes allowing permanent guardianship of a child adjudicated to be dependent and neglected under a preponderance of the evidence standard. *See In re A.G.*, 900 A.2d 677, 680 (D.C. Ct. App. 2006); *In re R.W.*, 10 P.3d 1271, 1276 (Colo. 2000); *In re Dependency of F.S.*, 913 P.2d 844, 846-47 (Wash. Ct. App. 1996). These courts have ruled that "for statutes terminating only some of a parent's rights to his or her child, the preponderance of the evidence standard does not violate the Constitution's due process requirements." *In re A.G.*, 900 A.2d at 680. As outlined above, the transfer of legal custody or the creation of a permanent guardianship does not end the parent-child relationship. *See* Tenn. Code Ann. §§ 37-1-140(a), 37-1-803(a); *In re A.G.*, 900 A.2d at 680. Furthermore, the Tennessee statute requires a finding of

---

[5]Mother does not dispute the trial court's finding that Gina was dependent and neglected.

dependency and neglect to be made based upon a clear and convincing evidence standard. Tenn. Code Ann. § 37-1-129.

Mother asserts that her rights were violated because, although she had an attorney, the court did not appoint a guardian ad litem to help her understand the impact of her decisions on her interests. We know of no authority that would require the court to appoint both a guardian ad litem and an attorney for a parent in dependency and neglect proceedings. Rule 32A(b) of the Tennessee Rules of Juvenile Procedure provides that, in dependency and neglect cases, "the child shall be represented by a guardian ad litem" and "the parent has a right to representation at all stages of the permanency planning process." Rule 2 of the Tennessee Rules of Juvenile Procedure defines a guardian ad litem as a lawyer "appointed by the court to protect the rights and interests of a child during the pendency of a proceeding involving the child and to advocate for the best interests of the child." The guardian ad litem and the attorney essentially fulfill the same role, the former for the child and the latter for the parent.[6] We reject Mother's contention that her interests were compromised by the court's failure to appoint a guardian ad litem for her.

Although Mother emphasizes the unfairness of Gina's placement in Texas in light of Mother's compliance with the permanency plan, Mother acknowledged to the trial court that she was consulted on the decision to pursue the placement of Gina with her maternal aunt in Texas and chose that option over leaving Gina with foster parents in Tennessee because Mother did not want the child to be adopted by the foster parents. Mother remains Gina's mother and retains the right to visit Gina and to petition the court to return custody to Mother.

CONCLUSION

The judgment of the trial court is affirmed. Costs of appeal are assessed against Mother, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[6]In cases in which the child's preferences may conflict with the child's best interests, Tenn. S. Ct. R. 40(e) allows for the appointment of a preference guardian ad litem.