2012 COA 131

**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**In the Interest of N.G., a Child,**

**and**

**Concerning J.P.W., Respondent–Appellant.**

**No. 12CA0417.**

Colorado Court of Appeals, Div. IV.

Aug. 2, 2012.

William Louis, County Attorney, Laura C. Rhyne, Deputy County Attorney, Colorado Springs, Colorado, for Petitioner–Appellee.

Nancy J. Walker–Johnson, Guardian Ad Litem.

Davide C. Migliaccio, Colorado Springs, Colorado, for Respondent–Appellant.

Opinion by Judge WEBB.

¶ 1 In this dependency and neglect proceeding, J.P.W. (father) appeals from the magistrate's order allocating permanent custody and parental responsibilities for N.G. (the child) to the child's maternal uncle, C.G. (uncle), and from the district court's order denying his petition for review of the magistrate's order. Father contends the magistrate erred by making this allocation before entering an adjudication of the child as to him or deciding his motion for custody of the child; the district court erred in finding that the magistrate could proceed without first revoking father's deferred adjudication; and the award of permanent custody to a nonparent under these circumstances violated his constitutional right to the care, custody, and control of his child.

¶ 2 We reach two conclusions, as a matter of law, on previously undecided issues in Colorado. First, a parent subject to a deferred adjudication, which has neither been revoked nor expired, is not barred by an earlier no-fault admission to the petition in dependency and neglect from requesting an evidentiary hearing and presenting evidence of events that have occurred during the deferral period, before entry of the adjudicatory order. Second, at the hearing, such a parent will usually enjoy the constitutional presumption that a fit parent makes decisions which are in his or her child's best interests.

¶ 3 Here, on the particular facts presented, we further conclude that both the magistrate and the district court erred in adjudicating the child as to father, based on the adjudication as to the child's mother and without considering his new evidence that the child would not be dependent or neglected if placed in his care; both also erred in failing to acknowledge father's presumption as to the decisions of a fit parent; and on remand, after hearing new evidence, the magistrate shall make findings whether the child is currently dependent or neglected as to father, in light of this presumption. Therefore, we vacate the orders and remand for further proceedings.

I. Background

¶ 4 In June 2010, the El Paso County Department of Human Services (DHS) removed N.G., then five years old, from the care of L.V. (mother) because of concerns about her drug use. The child was placed in uncle's care.

¶ 5 Father, a resident of Arizona, learned of the child's removal from mother. He had not seen the child in three years, but was voluntarily paying child support. When contacted by DHS, father expressed an interest in becoming part of the child's life. At his request, the court ordered testing, which confirmed paternity.

¶ 6 On August 23, 2010, father, through counsel, admitted paragraph 4(d) of the Amended Petition in Dependency and Neglect, which alleged that father did not reside in the home of mother and the child, and that the incidents which had led to the removal of the child from the home "place[d] the welfare of the child at risk," but were "beyond his immediate control."[1] Based on this admis-

---

1. Father's admission was made under an agreement with DHS that provided:

sion, the magistrate sustained the allegations of the Amended Petition as to father under paragraph 3(e) (the child was dependent and neglected as defined in section 19–3–102, C.R.S.2011, because the child was "homeless, without proper care, or not domiciled with a parent, guardian, or legal custodian through no fault of such child's parent, guardian, or legal custodian"). The record does not include a transcript of this proceeding.

¶ 7 After DHS submitted the paternity test results to the court, a treatment plan was prepared for father and adopted by the court. The plan required father to cooperate with DHS and the child's guardian ad litem (the GAL); undergo a mental health assessment; participate in visitation if visits were approved; and continue providing financial support for the child.

¶ 8 Two months later, father visited the child in Colorado. The caseworker reported that although the child was shy at first, the visit went well. Father also completed his mental health evaluation. The evaluator recommended that father participate in a "parenting program for fathers" and receive "life skills parenting" in-home services, if the child was placed in his care. No mental health problems were identified and no mental health treatment was recommended. At father's request, a study of his home was done by Arizona authorities under the Interstate Compact on the Placement of Children (ICPC). A favorable report was submitted to the court in January 2011.[2]

¶ 9 On January 21, 2011, two days after the ICPC report was submitted to the court, father moved for placement and custody of the child. He asserted that he was not at fault for the circumstances underlying the dependency action; placement of the child

with him would conform to the goal of reunifying families; and he had a fundamental constitutional right to raise his son.

¶ 10 In February, a mediation was held to consider placing the child with father. After unsuccessfully attempting to reach him by telephone, the mediation proceeded. The participants decided that father should come to Colorado for "at least a couple visits," after which DHS would "look at" sending the child to Arizona for a week. However, the caseworker had difficulty reaching father to discuss these decisions. He attempted only one visit with the child, which was abandoned following an automobile accident.

¶ 11 In late May, DHS concluded that the child should be placed in the permanent custody of uncle. DHS moved to allocate parental responsibilities to him on June 1. DHS also requested that the magistrate enter an order adjudicating the child dependent and neglected as to mother, nunc pro tunc August 23, 2010, the date on which mother and DHS had entered into the agreement to defer the adjudication. The magistrate entered the requested order, which did not address father.

¶ 12 A hearing on the motion to allocate parental responsibilities to uncle "and review of father's deferred adjudication" was noticed for July 13. At the hearing, DHS and father disagreed whether his request for placement and custody of the child was before the court. The magistrate did not resolve the question. The caseworker, uncle, and father testified.

¶ 13 At the conclusion of the hearing, the magistrate asked the parties to submit briefs. In his brief, father again asserted that he was constitutionally entitled to a pre-

---

[A]djudication of the child is deferred for a six (6) month period and renewable for an additional six (6) months with an initial expiration on February 23, 2010[sic]; and is contingent upon Father's compliance with all court orders including visitation and treatment plans. If this deferred adjudication is revoked or would expire prior to closure of the case, an order of adjudication will enter retroactive to today's date; and through no fault of Father, it may be necessary to enter an adjudication to continue appropriate treatment, maintain protective orders, or meet the child's need for permanency.

The magistrate incorporated the agreement, and a similar agreement deferring adjudication as to mother, into its order of August 23, 2010.

2. Arizona authorities reported that father and his girlfriend of three years were employed and had already made plans to move into a larger home with a separate room for the child. Both of them stated that they wanted to have the child reside in their home. References provided with the report stated that father interacted well with his brother's children and other children in his life, and that he would be a good father to his own child.

sumption that he had a first and prior right to the custody and care of the child, and no evidence had proven otherwise. He further asserted, as relevant here, that he had fully complied with all that had been asked of him; the child had not been adjudicated as to him; and no ground existed to revoke his deferred adjudication.

¶ 14 The parties and the magistrate agreed that a ruling should be made before August 23, 2011, the date father's deferred adjudication was to expire, and DHS moved to revoke father's deferred adjudication. However, on August 22, the magistrate announced that a further continuation was necessary to review the parties' briefs.

¶ 15 Two weeks later, the magistrate issued a written order finding that the court had personal and subject matter jurisdiction to enter an order allocating parental responsibilities to uncle "because the child was adjudicated dependent or neglected based on mother's admission and/or previous adjudicatory order(s) of the court regarding the parent(s)." Citing father's failures during the case to visit the child more than once, to call the child more than five or six times, and to send presents or cards to the child, the magistrate also found that the best interests of the child would be better served by placement with uncle. The magistrate granted the motion to allocate parental responsibilities to uncle and denied father's motion for placement and custody of the child.

¶ 16 However, the magistrate did not rule on the motion of DHS to revoke the deferred adjudication of the child as to father or father's motion for custody of the child. The magistrate also declined to rule on whether father's fundamental rights as a presumptive fit parent, recognized in *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), required that he be accorded a first and prior right to the custody of the child.

¶ 17 Father moved the district court for review of the magistrate's ruling. He argued, as relevant here, that the magistrate lacked jurisdiction to deny him custody of his son because the child had not been adjudicated as to him, and that the ruling violated his fundamental right to the care, custody, and

control of the child. The court concluded that because the magistrate had adjudicated the child as to mother, the magistrate had not erred in allocating parental rights to uncle without first revoking father's deferred adjudication and separately adjudicating the child as to him. Alternatively, the court said that "[t]o the extent error might be determined for the failure to enter a specific revocation," and having reviewed the entire record, it found that the deferred adjudication as to father should be and was revoked. Relying on *People in Interest of N.D.V.*, 224 P.3d 410 (Colo.App.2009), and father's admission to paragraph 4(d) of the amended petition, the court then entered an adjudication as to father nunc pro tunc August 23, 2010, when the original deferred adjudication had been entered. It referenced evidence presented to the magistrate and findings "that father had significantly failed to comply with his treatment plan."

## II. Law

### A. Adjudication

¶ 18 Under Article 3 of the Children's Code, "the state can intercede to protect the health, safety, and welfare of minors from abuse, neglect, or abandonment." *L.L. v. People*, 10 P.3d 1271, 1275 (Colo.2000). Often, this process begins when a law enforcement officer or other person observes that a child is neglected or dependent. If a preliminary investigation suggests that further action is required, the court may authorize the filing of a petition to adjudicate the child dependent or neglected. § 19–3–501(1), C.R.S.2011.

¶ 19 An adjudicatory hearing is then scheduled, "where the state must establish by a preponderance of the evidence that a child is dependent or neglected." *L.L.*, 10 P.3d at 1275. The child's parent may demand a jury trial at the adjudicatory stage of the proceeding and require that the state prove the allegations of the petition. § 19–3–202(2), C.R.S.2011. Alternatively, a parent may waive this right and instead confess, stipulate, or elect not to contest all or part of the petition, provided that the parent is "fully advised" as to all of his or her rights and

"the possible consequences of a finding that a child is dependent or neglected." C.R.J.P. 4.2(a). Before accepting a parent's confession, stipulation, or admission, the court must find that (1) the parent understood his or her rights, the allegations in the petition, and the effect of the admission, and (2) the admission is voluntary. C.R.J.P. 4.2(c).

¶ 20 If the court finds that the allegations of the petition are supported by a preponderance of the evidence, the court shall sustain the petition and enter an order of adjudication setting forth that the child is neglected or dependent. § 19–3–505(7)(a), C.R.S.2011. After the child has been adjudicated, "the court has the authority to order a variety of dispositions." *L.L.*, 10 P.3d at 1275. Upon the filing of a motion for termination, if the court "determines that the goal of maintaining the family unit is not feasible, for any of the reasons listed in section 19–3–604, the court may order termination of the parent-child relationship." *Id.* Proof must be by "clear and convincing evidence." *Id.* at 1276.

¶ 21 However, if the court finds that the allegations of the petition are not supported by a preponderance of the evidence, then the court "shall order the petition dismissed"; discharge the child and his or her parents from any restrictions or other previous orders; and return the child to parental custody. § 19–3–505(6), C.R.S.2011.

## B. Deferred Adjudication

¶ 22 After making a finding under section 19–3–505(7)(a) that the allegations of the petition are supported, and with the consent of the parties, who must be "fully informed by the court of their rights," the court may continue the adjudicatory hearing for a period of up to six months. On review, it may continue the hearing for an additional six months, after which "the petition shall either be dismissed or sustained." § 19–3–505(5), C.R.S.2011. However, the statute does not address the grounds or procedure for revoking a deferred adjudication before one or both of the six-month periods in section 19–3–505(5) have expired, or whether upon revocation, the court should enter an adjudicatory order without further inquiry. Nor does it address the following anomalies that may arise in connection with a deferred adjudication:

- A parent expressly or impliedly, such as by identifying new evidence, seeks to controvert the parent's admission that was the basis for the preponderance finding under section 19–3–505(7)(a); and

- Without revoking the deferred adjudication or making further findings concerning the child's current status, the court adjudicates the child as dependent or neglected.

¶ 23 We conclude that in permitting a continuation of the adjudicatory hearing, section 19–3–505(5) contemplates reconsidering the child's status before entering the adjudicatory order, although the court has made the preponderance finding required under section 19–3–505(7)(a); reconsideration may be requested expressly or impliedly; and reconsideration should be accompanied by any additional findings required to address new evidence and the child's current status.

¶ 24 When interpreting a statute, a court must strive to give effect to the intent of the General Assembly. The court first looks to the plain and ordinary meaning of the words of the statute. Because the language at issue must be read in the context of the statute as a whole and the context of the entire statutory scheme, any interpretation should give consistent, harmonious, and sensible effect to all parts of a statute. *Jefferson County Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 935 (Colo.2010).

¶ 25 Because adjudication relates to "the status of the child as of the date of the adjudication," *K.D. v. People*, 139 P.3d 695, 699 (Colo.2006), continuing the adjudicatory hearing suggests postponement of a final decision whether the child is or remains dependent or neglected, subject to presentation of additional evidence. Reading sections 19–3–505(5) and 19–3–505(7)(a) together, the following provisions further support the interpretation that where adjudication has been deferred, the preponderance determination under the first clause of section 19–3–505(7)(a) is not final:

- Section 19–3–505(7)(a) refers to entering "an order of adjudication," while section

19–3–505(5) allows the court to "continue the [adjudicatory] hearing." If further proceedings could not influence the adjudication because the preponderance determination was final and binding, the adjudicatory hearing would be without purpose, and the latter section could have provided for a continuance of entry of the order of adjudication instead. *Holcomb v. Jan–Pro Cleaning Sys. of S. Colorado,* 172 P.3d 888, 894 (Colo.2007) (we do not presume that the legislature used language idly).

- Section 19–3–505(5)(b) provides that following the deferral period, "the petition shall either be dismissed or sustained." But if the preponderance determination was final and binding, notwithstanding the deferral of the adjudication, the petition would have to be sustained in all cases, unless it had been withdrawn.

¶ 26 Having so concluded, we necessarily further conclude that during the deferral period, a parent may seek to present evidence probative of the current status of the child as to that parent, the continued vitality of any admission to a petition alleging dependency and neglect, or both.[3] Although the Children's Code does not expressly allow a parent to do so, foreclosing presentation of such evidence, based on the admission, would be contrary to determining the child's status as of the date of the adjudication. Allowing the parent to present new evidence is also consistent with reunifying the family, which is one of the goals of a dependency and neglect proceeding.[4]

¶ 27 Thus, at the end of the deferral period, the court should address both the ongoing probative value of any parental admission and the parent's new evidence in findings either adjudicating the child dependent and neglected as to the parent or ordering the petition dismissed and the child returned to parental custody.[5]

## C. The *Troxel* Presumption

¶ 28 In *Troxel,* the widowed mother of two children attempted to limit the children's visits with their paternal grandparents. Relying on a state statute that afforded grandparents visitation rights, they filed a petition for visitation. 530 U.S. at 61–62, 120 S.Ct. 2054.

¶ 29 The Supreme Court noted that the Fourteenth Amendment's Due Process Clause, like its Fifth Amendment counterpart, guarantees more than a fair process; it includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 65. The Court identified one such fundamental right as the interest of a parent in the care, custody, and control of his or her child. *Id.*

¶ 30 The Court held that because "there is a presumption that fit parents act in the best interests of their children," (the "*Troxel* presumption"), *id.* at 68, 75, 120 S.Ct. 2054, the state statute violated the Due Process Clause. Based on this presumption, the Court explained that "there is no reason for the State to inject itself into the ability of [a fit] parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68, 120 S.Ct. 2054. For purposes of the *Troxel* presumption, a parent is "fit" "so long as [he or she] adequately cares for his or her children." *Id.*[6] Thus, when the

**3.** We express no opinion whether a parent may make such a request after the expiration of the deferral period.

**4.** *See, e.g.,* § 19–1–102(1)(a)–(b), C.R.S.2011 ("[t]he [G]eneral [A]ssembly declares that the purposes of this title are: [t]o secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society" and "[t]o preserve and strengthen family ties whenever possible ..."); § 19–3–100.5(1), C.R.S.2011 ("[t]he [G]eneral [A]ssembly hereby finds and declares that the stability and preservation of the families of this state and the safety and protection of children are matters of state-wide concern").

**5.** Here, because the magistrate never ruled on the motion to revoke father's deferred adjudication, and as indicated the statute is silent, we do not address the procedures that should be employed in that scenario.

**6.** This definition applies only with regard to the *Troxel* presumption; it does not supplant the statutory definition for determining unfitness that applies in parental termination proceedings. *See* § 19–3–604(2); *People in Interest of A.M.D.,* 648 P.2d 625, 638 (Colo.1982) ("[A] parent is

state proves that a parent is unwilling or unable adequately to care for his or her children, the *Troxel* presumption does not bar state authorities from intervening in the parent-child relationship to prevent harm to children. *In Interest of E.L.M.C.*, 100 P.3d 546, 556 (Colo.App.2004) (*citing Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944)).

■ ¶ 31 In Colorado, a child may be adjudicated dependent and neglected on a showing by a preponderance of the evidence that, among other things, the child lacks proper parental care through the actions or omissions of the parent, or the child's environment is injurious to his or her welfare. § 19–3–102(1)(b), (c). Proof of either condition is, necessarily, also proof that the parent is not adequately caring for his or her child. Hence, when a court finds such circumstances by a preponderance of the evidence, the presumption that the parent is acting and will act in the best interests of the child has been overcome.

¶ 32 This conclusion is consistent with the holdings of another division of this court and the courts of other states. *People in Interest of C.M.*, 116 P.3d 1278, 1283 (Colo.App.2005); *In re Child of Evenson*, 729 N.W.2d 632, 636 (Minn.Ct.App.2007) (*Troxel* presumption is overcome in a custody proceeding establishing neglect); *State ex rel. M. W.*, 12 P.3d 80 (Utah 2000) (no *Troxel* presumption when there has been a factual determination that

the child has been neglected); *Duncan v. Howard*, 918 P.2d 888, 892 (Utah Ct.App. 1996) (parent who has never had legal custody nevertheless is entitled to *Troxel* presumption where he has never lost his right to assert the presumption due to an adjudication of any lack of fitness as a parent).

¶ 33 Accordingly, because an adjudicatory order finding a child dependent or neglected is the equivalent of a finding that the child is not adequately being cared for, we conclude that, upon such a finding, the *Troxel* presumption that the parent is acting or will act in the best interests of the child has been overcome.

¶ 34 However, this conclusion does not end our inquiry because no Colorado court has determined whether the *Troxel* presumption may sometimes be overcome at an earlier stage of a dependency or neglect proceeding.[7] Further, and as particularly relevant here, the parties have not cited, nor have we found in any jurisdiction, precedent specifically addressing the status of this presumption during a dependency and neglect or similar proceeding that has gone forward on the basis of a deferred adjudication, but without entry of an adjudicatory order.[8] Nevertheless, we draw two further conclusions.

■ ¶ 35 First, the mere judicial authorization to file a petition alleging dependency or neglect does not overcome the *Troxel* presumption.[9] Holding otherwise would dis-

---

unfit only if continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or ... the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care.") (decided under predecessor statute).

7. Courts in other jurisdictions have recognized, at least generally, that during the initial stages of an investigation into possible abuse or neglect of a child, constitutional protection of a parent's right to the custody and control of his or her child remains in place, except where emergency action is necessary to protect the child from imminent harm. *See, e.g., Tenenbaum v. Williams*, 193 F.3d 581, 600–01 (2d Cir.1999) (parents and child have a substantive right under the Due Process Clause "to remain together without the coercive interference of the awesome power of the state"; however, separation of the child from her parents for a few hours in an effort to obtain assurance that she had not been

abused was not sufficient to constitute a violation of their substantive due process rights); *Gomes v. Wood*, 451 F.3d 1122, 1127–28 (10th Cir.2006) (when a state agency seeks to remove children from the home, due process requires that the parents receive prior notice and a hearing, except in "extraordinary situations," such as emergency circumstances which pose an immediate threat to the safety of the child).

8. This dearth of precedent may be the result of few, if any, other states having a similar deferral procedure.

9. Under section 19–3–501(1), C.R.S.2011, such authorization proceeds from a "preliminary investigation," which is not a determination on the merits as to dependency or neglect. The statute does not require notice to parents, appointment of counsel, or an opportunity to be heard before the court authorizes the petition to be filed. Once the petition has been filed, a summons

regard the preliminary stage of the proceeding and the limited protection afforded parents at that stage.

¶ 36 Second, our analysis showing that where the adjudication has been deferred, the preponderance determination is not final as to the merits of the allegations set forth in the dependency or neglect petition necessarily leads to the conclusion that the *Troxel* presumption will ordinarily survive such a preponderance determination. This is especially so where that determination was based only on a parent's no-fault admission.[10] This conclusion is also consistent with the requirements for a final factual determination in cases such as *Duncan v. Howard* and *State ex rel. M.W.*

### III. Application

#### A. Standard of Review

¶ 37 A petition for district court review of an order entered by a magistrate is a prerequisite to an appeal of such order. § 19-1-108(5.5), C.R.S.2011. A district court reviewing a magistrate's decision under C.R.M. 7(a) may not alter the magistrate's factual findings unless clearly erroneous. C.R.M. 7(a)(9). Our review of the district court's decision is effectively a second layer of appellate review, and, like the district court, we must accept the magistrate's factual findings unless clearly erroneous. *In re G.E.R.*, 264 P.3d 637, 638–39 (Colo.App.2011). We may, however, set aside a district court's order based on errors of law or findings that do not conform to the statutory criteria. *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo.App.2009).

#### B. Father's Right to Adjudication

¶ 38 Initially, we reject the argument of DHS, and the holding of the district court, that the Children's Code requires only an adjudication "as to" one parent or the other, but not both, thus rendering an adjudi-

cation as to father unnecessary because the child has been adjudicated dependent or neglected as to mother. This view has some support in the statement, "[A]djudications of dependency or neglect are not made as to the parent but, rather, relate only to the status of the child as of the date of the adjudication." *People in Interest of S.B.*, 742 P.2d 935, 939 (Colo.App.1987). However, *"[e]ach parent has the right to a jury determination as to whether the facts alleged in the petition have been proved." People in Interest of A.H.*, 271 P.3d 1116, 1120 (Colo.App.2011) (emphasis added); *see* § 19-3-202(2) ("any respondent … may demand a trial by jury"); *see also People v. Owens*, 219 P.3d 379, 384 (Colo.App.2009) ("any" means "all"). Further, an admission by one parent "is not necessarily dispositive" of allegations disputed by the other parent. *S.G.L.*, 214 P.3d at 583.

¶ 39 We interpret *S.B.* as standing for the proposition that at the adjudicatory stage, the question before the court is not whether the parent's status warrants state intervention, but whether the child's status warrants state intervention. At the adjudicatory stage, "[a]n action in dependency or neglect is designed to determine whether the child, for whatever reason, lacks the benefit of parental guidance, concern, protection, or support." *S.B.*, 742 P.2d at 939. Hence, in our view, this determination is proper only after the state has shown that the child cannot safely be placed in the care of *either* parent.

¶ 40 This conclusion implements our holding that each parent is constitutionally presumed to be a fit parent capable of making decisions in the best interests of the child, unless and until the court has found that the child was (or would be) dependent or neglected in the parent's care. We are unaware of any authority suggesting that such a constitutional right could be lost vicariously, based on the fault of another person.

must be issued and served personally informing the child's parents of their "constitutional and legal rights," including "the right to have an attorney present at the hearing on the petition." § 19-3-503(1), C.R.S.2011.

10. Because the question is not before us, we leave for another day deciding the weight that a court must give to the *Troxel* presumption when entering temporary orders before the adjudication, based on other evidence that a parent is not adequately caring for the child.

¶ 41 Therefore, here the adjudication of the child "as to" mother did not avoid the need for an adjudication "as to" father. To the extent that the magistrate and the district court found otherwise, we conclude that both erred. For this reason alone, the allocation of permanent custody and parental responsibilities to uncle cannot stand.

### C. Father's No–Fault Admission

¶ 42 We next reject the argument of the GAL, and the rationale of the district court, that under *N.D.V.*, 224 P.3d at 418, father's no-fault admission allowed the magistrate to issue a dispositional order, despite the lack of an adjudication, and if the magistrate's failure formally to revoke the deferred adjudication and adjudicate the child as to father was error, it was harmless based on the evidence presented at the June 13 hearing. The GAL refers to, and the district court relied on, evidence that father had not complied with his treatment plan, which would trigger revocation of the deferred adjudication under the parties' agreement, and that the child needed permanency. Because both the magistrate and the district court cited *N.D.V.*, we begin there.

### 1. *N.D.V.*

¶ 43 In *N.D.V.*, the mother appeared at the adjudicatory hearing, admitted that her child was neglected or dependent, and waived proof of a factual basis that the child was homeless, without proper care, or not domiciled with the mother through no fault of hers. The court accepted the admission, and, at the mother's request, deferred entry of the order of adjudication and continued the hearing as permitted under section 19–2–505(5). The mother was provided with a treatment plan and the case proceeded. Nearly a year later, the state moved to terminate the mother's parental rights.

¶ 44 Although the motion to terminate incorrectly stated that the child had been adjudicated dependent or neglected on the date of the adjudicatory hearing, the mother failed to point out this error. Ultimately, the court applied the requisite statutory factors and terminated her parental rights, but found, erroneously, that the child had been adjudicated dependent or neglected as to the mother on the date of the adjudicatory hearing.

¶ 45 On appeal, the mother contended that the court's failure to enter an adjudicatory order within the time permitted under section 19–3–505(5) deprived it of jurisdiction to terminate her parental rights. *N.D.V.*, 224 P.3d at 413. In a split decision, the division disagreed, concluding that a juvenile court's subject matter jurisdiction in dependency or neglect cases is based on the fact of the child being dependent or neglected; the mother's admission of that fact and the court's acceptance of her admission established the essential factual predicate for the court's continued jurisdiction; and the court's failure to enter an order sustaining the petition was a procedural error, the mother waived that error by failing to raise the issue in the trial court, and that error did not divest it of jurisdiction. *Id.* at 416–17. However, *N.D.V.* is distinguishable from this case in three ways.

¶ 46 First, father's motion for placement and custody of the child put the magistrate on notice of a potential change in circumstances and requested a re-evaluation of the child's status based on new information, including the ICPC report, showing that he could provide the child with a safe and loving home.

¶ 47 Second, father's post-hearing brief to the magistrate contested the allocation of parental rights to uncle based in part on the lack of an adjudicatory order as to father. Likewise, his motion for review noted the magistrate's failure to enter an adjudicatory order. Thus, the lack of such an order has not been waived, assuming, without deciding, that it could be.

¶ 48 Third, the *N.D.V.* majority declined to "determine what actions would be required if a parent, after admitting the petition, later sought to withdraw the admission before entry of an adjudicatory order or contested termination based on the lack of an adjudicatory order." 224 P.3d at 417 n. 2 & 418 n. 3. Here, although father did not specifically seek to withdraw his admission, he indicated that he was prepared to show the factual basis for his admission, (he did not reside in the same home as the child and thus was not

in a position to protect him), could be remedied.

### ¶ 49 2. Waiver and the Deferred Adjudication Agreement

¶ 50 Having concluded that *N.D.V.* does not control, we next consider whether, by entering into the deferred adjudication agreement, father waived his right to request an adjudicatory hearing and present new evidence. We agree with DHS that father "waived his right to a jury trial" when he did so. However, to the extent that DHS suggests father also waived his right to request an adjudicatory hearing and further findings on the child's current status, based on evidence of events occurring during the deferral period, we disagree.

¶ 51 In general, statutory rights may be waived if the waiver is voluntary. *See People v. Duran,* 757 P.2d 1096, 1097 (Colo.App.1988) (waiver of a statutory right must be voluntary but need not be knowing and intelligent). Such a waiver may be either express or implied. *People in Interest of L.A.C.,* 97 P.3d 363, 367 (Colo.App.2004).

¶ 52 Here, the magistrate found that when father entered into the deferred adjudication agreement, he "knowingly and intelligently waived his right to a trial before the Court"; voluntarily entered his admission to the Amended Petition; and agreed that an order of adjudication could be entered if he failed to comply with his treatment plan or if entry of the order was deemed necessary to continue appropriate treatment, maintain protective orders, or meet the child's need for permanency. These findings overstate the language of the agreement, which was not drafted with the benefit of our interpretation of the deferral statute, and are at odds with that interpretation.

¶ 53 The agreement is silent as to whether father could request a hearing to determine the child's current status on the basis of new evidence. Although the agreement references entering "an order of adjudication ... retroactive to today's date" under certain circumstances, it does not contain an express waiver of father's right to request the adjudicatory hearing that was deferred. Nor does it preclude him from presenting new evidence at such a hearing, including evidence controverting his admission. Further, finding an express waiver in the language of the agreement would be problematic because the record is silent whether father was "fully informed by the court of [his] rights," as required by section 19–3–505(5)(a), C.R.S. 2011, and fully advised of the effect of his admission as required by C.R.J.P. 4.2(c).[11]

¶ 54 Although the magistrate did not refer to implied waiver, because a lower court's decision can be affirmed on grounds not addressed below, we consider and also reject implied waiver. Based on the agreement, the petition was sustained as to circumstances that had arisen "through no fault" of father. The absence of fault weighs against implying waiver of the right to request a hearing regarding the child's status.

¶ 55 Nor are we persuaded that an implied waiver can be found in father's actions. To the contrary, his prompt efforts to obtain a home study after testing confirmed paternity weigh against a finding that he intended to waive his right to seek an adjudicatory hearing concerning the child's current status. And in any event, finding an implied waiver would be even more problematic because of the lack of the advisement discussed above.

¶ 56 Therefore, because father did not waive his right to an adjudicatory hearing on the child's current status, we further conclude that the magistrate erred by not addressing father's evidence presented at the hearing, before allocating parental rights to uncle.

### 3. Father's Motion for Placement and Custody of the Child and Offer of New Evidence

¶ 57 We conclude that the magistrate also erred in failing to rule on father's motion for placement and custody of the child, and in

---

11. We express no opinion whether, with a proper advisement, the parties could agree to defer entry of the order of adjudication but renounce any right to present new evidence, thus rendering the parent's admission irrevocable.

declining to address the *Troxel* presumption, before allocating parental rights to uncle.

¶ 58 The purpose of an adjudicatory hearing is to determine whether the status of the subject child "warrants intrusive protective or corrective state intervention into the familial relationship." *A.H.*, 271 P.3d at 1120. In moving for placement and custody of the child, father identified new evidence regarding his fitness to care for the child, which was relevant to whether the child would be dependent or neglected if placed in his care. State intervention is not warranted when a child has a fit parent who can meet the child's needs. *Id.* at 1121. Here, this is especially important because the petition and father's admission were premised on the child's circumstances while in mother's custody and did not preclude the possibility that father could provide a proper home for the child at the time of the hearing, long after the child had been removed from mother's custody.[12]

¶ 59 Because father's parental fitness must be determined on remand, we address whether, on the particular facts presented, he has retained the *Troxel* presumption. For the following reasons, we further conclude that he has:

- A proper and final adjudicatory order, which we have concluded would extinguish this presumption, had not entered.
- The magistrate declined to address the interplay between the presumption recognized in *Troxel* and a proceeding such as that before us, as a matter of law.
- We have concluded that father neither expressly nor impliedly waived his statutory right to request a hearing and contest his admission by presenting new evidence, before the magistrate made a final decision sustaining or dismissing the petition. We reach the same conclusion as to whether father waived the *Troxel* presumption because a higher standard applies to waiver of constitutional rights than to that of statutory rights. *Compare Duran*, 757 P.2d at 1097 (waiver of a statutory right must be voluntary but need not be knowing and intelligent), *with People v. Curtis*, 681 P.2d 504, 511 (Colo.1984) (waiver of a fundamental constitutional right such as the right to a jury trial must be "voluntary, knowing, and intentional").

- The deferral agreement is silent about *Troxel*.
- The lack of an advisement concerning father's constitutional rights precludes finding a waiver of such rights. *Cf. People v. Shari*, 204 P.3d 453, 460 (Colo. 2009) (defendant must be advised on right to conflict-free counsel).

Therefore, for this reason as well, the allocation to uncle must be set aside.

### D. The District Court's Order

¶ 60 The district court concluded that the magistrate's failure to "actually invoke the words of revocation of the deferred adjudication" was harmless error, and that if it was not harmless, the error could be corrected when the court exercised its discretion to modify the magistrate's order to find that the deferred adjudication as to father was revoked as of August 23, 2010, the date father admitted to the petition and entered into the deferred adjudication agreement. We disagree with both conclusions.

¶ 61 The court first concluded that because the magistrate had adjudicated the child "as to" mother, there was no need for a second adjudication "as to" father. As discussed above, this was error because each parent has the right to contest the adjudication of the child.

¶ 62 The court next concluded that under *N.D.V.*, subject matter jurisdiction was continued when father made a factual admission under paragraph 4(d) of the petition and the magistrate sustained the petition under paragraph 3(e) but deferred the formal entry of adjudication. Although the majority opinion in *N.D.V.* could be read to support this holding, we have concluded that *N.D.V.* is not dispositive of the magistrate's power to allo-

---

12. We note that some admissions, such as having abused the child, could have much stronger ongoing probative value.

cate parental responsibilities (or terminate parental rights) without entering an order of adjudication, where, as here, father expressly challenged the lack of such an order. And here, because father's motion for placement and custody of the child referenced new evidence, it was in effect a proper request that the magistrate conduct the deferred hearing and determine the child's current status, based on that evidence and notwithstanding father's admission.

 ¶ 63 Alternatively, the court further explained that it had reviewed the record and held the magistrate's failure to formally revoke the deferred adjudication as to father harmless because "the magistrate took evidence and entered specific findings which clearly sustained the [allocation of parental rights] holding and the conclusions that father had significantly failed to comply with his treatment plan." Based in part on our resolution of previously unresolved legal issues, we reject this explanation.

 ¶ 64 In determining whether the evidence is sufficient to sustain an adjudication, we review the record in the light most favorable to the prevailing party, and we draw every inference fairly deducible from the evidence in favor of the court's decision. *S.G.L.*, 214 P.3d at 583. We will not disturb a district court's findings and conclusions if the record supports them, even though reasonable people might arrive at different conclusions based on the same facts. *Id.* We may, however, set aside a district court's order based on errors of law or findings that do not conform to the statutory criteria. *Id.*

 ¶ 65 The magistrate's findings and conclusions are not sufficient to sustain an adjudication as to father, for the following reasons:

- The magistrate did not make findings regarding the *Troxel* presumption as to father.

- The magistrate applied the "best interests of the child" standard to reach a conclusion that the child should be placed with uncle. The "best interests" standard may properly be applied in an allocation of parental rights proceeding, but a child may not be adjudicated dependent or neglected "merely because the People contend that his condition would be improved by changing his parents or custodians." *People in Interest of T.H.*, 197 Colo. 247, 249, 593 P.2d 346, 348 (1979). Rather, state intervention should be limited to instances of neglect and dependency "as defined in the statute." *Id.*

- The magistrate found "by clear and convincing evidence" that placement of the child with father would result in "serious physical or emotional harm" to the child.[13] However, the magistrate did not cite any evidence that the child would be unable to establish a healthy parent-child relationship with father if given the opportunity to do so. Our review of the record reveals no such evidence, and father's evidence is to the contrary. An adjudication may not be based on mere speculation concerning future possibilities. *People in Interest of C.T.*, 746 P.2d 56, 58 (Colo.App.1987).

---

13. Although the magistrate did not state a reason for making this finding, we note that the child is an Indian child, and, under the terms of the Indian Child Welfare Act (the ICWA), in a "child custody proceeding" subject to the ICWA, "[n]o foster care placement may be ordered ... in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e). Because these issues have not been raised on appeal, we express no opinion whether uncle is an "Indian custodian" as defined in 25 U.S.C. § 1903(6); or, alternatively, whether the proposed allocation of parental rights to uncle constitutes a "foster care placement" as defined in 25 U.S.C. § 1903(1)(i). Nor do we resolve whether the proceeding is a "child custody proceeding" as defined in 25 U.S.C. § 1903(1), or whether, assuming but not deciding that it is a child custody proceeding (and therefore subject to the ICWA), a finding that the continued custody of the child by the parent is "likely to result in serious emotional or physical damage to the child" would, if supported by the record, also support a further finding that the child is dependent or neglected as to the parent, rendering a separate hearing on the issue of adjudication procedurally superfluous.

- Father admitted only that the child was dependent or neglected as to him because conditions in mother's home "place[d] the welfare of the child at risk," but were "beyond his immediate control." Although this admission was sufficient to show that the child was dependent or neglected as to father at the inception of the case, it does not show that the child would be dependent or neglected if father were permitted to assume custody and care for the child before the magistrate allocated permanent custody and parental responsibilities to uncle. *See K.D.*, 139 P.3d at 699 (adjudication relates to the child's status as of the date of the adjudication).

¶ 66 Therefore, we conclude that the trial court could not rely on the magistrate's findings to support its retrospective adjudication of the child dependent or neglected as to father. Further, because the magistrate erred in failing to consider father's new evidence, in light of the *Troxel* presumption, we further conclude that the district court—which also failed to consider father's fit parent presumption—erred in not vacating the magistrate's order on constitutional grounds as well.

### IV. Conclusion

¶ 67 The district court's order denying father the relief he requested in his petition for review of the magistrate's order allocating parental rights to uncle is vacated, the magistrate's order is vacated, and the case is remanded to the district court with instructions to remand the case to the magistrate. The court shall instruct the magistrate to conduct further proceedings regarding father's motion for placement and custody of the child, consistent with this opinion.

¶ 68 On remand, if father maintains that he is willing to provide a home for the child, the magistrate must determine the ongoing probative value of father's no-fault admission; consider any evidence of his ability to parent the child that has arisen since he admitted to the petition; make findings whether father's presumed status as a fit parent has been overcome, considering all evidence whether the child, if now placed in his care, would be dependent or neglected; and rule on father's motion for placement and custody, in light of the presumption that his decision to seek custody of the child was in the child's best interests, all before entering any further orders regarding the child.

¶ 69 If either DHS or the GAL contends that the child will still be dependent or neglected if placed in father's care, the magistrate shall permit the filing of an amended petition in dependency or neglect setting forth the basis for such a contention. In that event, the parties shall be permitted to submit further evidence, and the magistrate shall determine whether the evidence supports the allegations of the amended petition. Because adjudication relates to the status of the child as of the date of the adjudication, the magistrate may allow the parties to present new evidence, even if an amended petition is not filed.

¶ 70 The magistrate shall then either dismiss or sustain the petition.[14] Either party may seek review of the magistrate's order in the district court.

Judge CARPARELLI and Judge LICHTENSTEIN concur.

---

14. Because the issue was not raised on appeal, we express no opinion as to whether an updated ICPC home study may be required as part of any further adjudicatory proceedings. We note that courts in other jurisdictions are divided as to whether the ICPC applies to the placement of a child with an out-of-state parent, and if so, under what circumstances a home study may be required. *Compare Arizona Dep't of Econ. Sec. v. Leonardo*, 200 Ariz. 74, 22 P.3d 513, 522 (App. 2001) (ICPC applies to out-of-state placement with a noncustodial parent), *with In re Alexis O.*, 157 N.H. 781, 959 A.2d 176, 183–85 (2008) (ICPC does not apply to out-of-state placement with a parent).