25CA2235 Peo in Interest of IC 05-14-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA2235
City and County of Denver Juvenile Court No. 25JV30395
Honorable Ann Gail Meinster, Judge

---

The People of the State of Colorado,

Petitioner,

In the Interest of I.C., Z.C., D.C., T.C., M.C., E.C., and N.C., Children,

and Concerning A.A. f/k/a M.M.C.,

Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE LUM
Welling and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 14, 2026

---

Miko Brown, City Attorney, Christina R. Kinsella, Assistant City Attorney, Denver, Colorado, for Petitioner

Debra W. Dodd, Counsel for Youth, Berthoud, Colorado, for I.C.

Debra W. Dodd, Guardian Ad Litem, for Z.C., D.C., T.C., M.C., E.C., and N.C.

Michael Kovaka, Office of Respondent Parents' Counsel, Littleton, Colorado, for Appellant

¶ 1     In this dependency or neglect action, the children's parent, A.A. (formerly known as M.M.C.), appeals the judgment entered on a jury's verdict adjudicating I.C., Z.C., D.C., T.C., M.C., E.C., and N.C. (the children) dependent or neglected. We affirm.

## I.     Background

¶ 2     Denver Human Services (the Department) filed a petition in dependency or neglect based on concerns that the children were living in a van with A.A. and the children's other parent, R.H. (mother); that the older children were not enrolled in or attending school; and that the children were dirty and hungry. The seven children ranged in age from eighteen months to twelve years old.

¶ 3     A.A. denied the allegations and requested an adjudicatory jury trial. After a six-day trial, the jury returned special verdicts finding that all seven children were dependent or neglected under section 19-3-102(1)(b)-(d), C.R.S. 2025. The jury unanimously determined that (1) all seven children lacked proper parental care as a result of A.A.'s acts or failures to act; (2) the children's environment was injurious to their welfare; and (3) A.A. failed or refused to provide the children with proper or necessary subsistence, education,

medical care, or any other care necessary for the children's health, guidance, or well-being.

## II. Sufficiency of the Evidence

¶ 4      A.A. contends that the evidence was insufficient to support the jury's verdict. We aren't persuaded.

## A. Standard of Review and Applicable Law

¶ 5      In determining whether the evidence is sufficient to sustain an adjudication of dependency or neglect, we review the record in the light most favorable to the prevailing party, and we draw every inference "fairly deducible" from the evidence in favor of the jury's decision. *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009); *People in Interest of T.T.*, 128 P.3d 328, 331 (Colo. App. 2005).

¶ 6      We will not reverse the jury's verdict even if reasonable people might arrive at different conclusions based on the same facts. *S.G.L.*, 214 P.3d at 583.

¶ 7      The purpose of an adjudicatory hearing is to determine the child's status as dependent or neglected under section 19-3-102 and whether that status warrants governmental intervention. *People in Interest of N.G.*, 2012 COA 131, ¶ 39; *see also K.D. v.*

2

*People*, 139 P.3d 695, 699 (Colo. 2006) (noting that the adjudication is not made as to the parents but relates only to the child's status).

¶ 8      As relevant here, a child is dependent or neglected when (1) the child lacks proper parental care through the actions or omissions of the parent; (2) the child's environment is injurious to their welfare; and (3) a parent fails or refuses to provide the child with proper or necessary subsistence, education, medical care, or any other care necessary for their health, guidance, or well-being. § 19-3-102(1)(b)-(d).  An adjudication may be based on current, past, or prospective harm.  *People in Interest of G.E.S.*, 2016 COA 183, ¶ 15.  Section 19-3-102 requires proof of only one condition for an adjudication.  *People in Interest of S.M-L.*, 2016 COA 173, ¶ 29 (a department need only prevail on one adjudicatory element), *aff'd on other grounds sub nom. People in Interest of R.S. v. G.S.*, 2018 CO 31.

¶ 9      An adjudication may not enter without proof, by a preponderance of the evidence, that the child is dependent or neglected.  *People in Interest of J.G.*, 2016 CO 39, ¶¶ 15, 53.  The preponderance standard allows for some uncertainty in the

determination of dispositive facts. *People in Interest of A.M.D.*, 648 P.2d 625, 634 (Colo. 1982).

¶ 10    The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn therefrom, are within the purview of the jury. *S.G.L.*, 214 P.3d at 583.

### B.    Analysis

¶ 11    The evidence at the adjudicatory trial centered on the family's homelessness and the children's lack of education and medical care. Taken together, that evidence supports the jury's verdicts that the children lacked proper parental care, would be in an injurious environment if returned to A.A.'s care, and that A.A. failed to provide the children with proper or necessary education or medical care.

¶ 12    First, an intake caseworker testified about "the family's struggle with homelessness," including that the parents and seven children had "liv[ed] out of their van for around two years." A police officer testified that the van was "cramped or cluttered," smelled like urine, and that "[t]here was some rotten fruit." The Department presented evidence that the children's clothes were dirty, wet, and

4

smelled like urine. The jury also heard that the children had chronic lice infections, and an intake caseworker testified that the infections were "hard to eradicate due to the living conditions." And A.A. testified that the five youngest children were "stateless," that they had "no birth certificate[s], no social security number[s]," and that "there [was] no record of their existence anywhere on earth."

¶ 13 An intake caseworker testified that when the Department first became involved the parents accepted help and "appeared to want to cooperate," but then "communication stopped and referrals continued to come in about the concerns and conditions of the [children]." Another intake caseworker testified that the parents "actively tr[ied] to flee" the Department and were found in Kansas by law enforcement after the juvenile court issued bench warrants.

¶ 14 Second, the Department presented evidence to support its allegation of educational neglect. An intake caseworker testified that mother reported that she had homeschooled the children and that they had never attended a public school. But there was also testimony that none of the school-aged children, including the twelve-year old youth, could read or write. And the twelve-year-old youth struggled to name or recognize numbers above ten.

¶ 15　The ongoing caseworker worried about the children's educational needs because there were "many school-aged children who [were] not able to read or write or do basic math." The caseworker testified that he "heard that [the children] ha[d] been educated, but yet, [he saw] no evidence of that." When the caseworker scheduled a meeting with the parents to discuss the children's educational needs, they did not attend. And the director of a church providing services to the unhoused testified that mother had no interest in enrolling the children in school.

¶ 16　A.A. argues that it was "undisputed that the parents had developed a curriculum for homeschooling and provided it to the Department." But the caseworker testified that the parents had "no concrete plans, worksheets, or anything of the sort that would identify . . . a curriculum."

¶ 17　Third, the jury heard testimony from medical professionals about the children's unmet medical needs. Early in the case, the children were assessed at a medical clinic. A physician's assistant (PA) from the clinic testified that she did not know of any medical history for the children prior to the Department's involvement. Indeed, there was evidence that an earlier doctor's visit — which

also occurred after the Department became involved — was the first time any of the children had been to a doctor's appointment.

¶ 18    The clinic's medical director, a doctor who was qualified as an expert in pediatric care, testified that she had concerns about the children's development, nutrition, and mental health. The three oldest children needed to be assessed to determine if they had a "language or learning issue or a neuropsychological issue or a developmental issue, like a learning disability, or whether that's a lack of exposure to [education]." The doctor opined that if the oldest child did not receive additional resources and support, she would not "be[] able to become an independent adolescent or adult."

¶ 19    The doctor also testified that some of the younger children did not exhibit "important social, emotional, developmental stages that are really critical for development." The doctor opined that it would be "very important" to have a specific medical diagnosis for one of the children to determine whether she needed medication or whether she would qualify for services related to developmental concerns, such as speech therapy, occupational therapy, or learning accommodations.

¶ 20    The PA testified that the ten-year-old child "appeared to be delayed in her development," and that "there was concern about [the three-year-old child's] speech." And the nineteen-month-old child did not speak at all, even though a child that age "generally . . . can be speaking somewhere between twenty to fifty words." The PA opined that some of the children "potentially medically have something that's keeping them from meeting those milestones or they haven't been given the education to meet those milestones."

¶ 21    A.A. testified that "most of [the older children's] issues lies [sic] in the dyslexia." And mother testified that she "pick[ed] up on, like dyslexia and possibly dyscalculia" while teaching the oldest child. A.A. testified that the children's dyslexia was "going to have to be addressed in the lesson plans," but that the parents did not "have any documentation of any standardized test [or assessments] for the children."

¶ 22    In arguing that the evidence was insufficient to establish that the children's environment was injurious to their welfare, A.A. points to testimony describing the family shelter at which the parents lived at the time of the adjudicatory trial. But the family

had previously been removed from that shelter because five of the children did not have birth certificates or social security numbers. A homeless rights activist who had worked with the family testified that whether the family had "overcome the barriers to housing" was "complex" because, while the parents were "indoors," the shelter was "not housing."

¶ 23 Moreover, the ongoing caseworker testified that he was concerned that the family would not remain at the shelter if the Department was not involved, because the parents intended to go to California or South America. He explained that the parents "ha[d] demonstrated a history of leaving the state during child welfare involvement in the past and [he] worr[ied] about that pattern continuing." As noted above, the parents had previously fled Colorado with the children on the day of the shelter hearing in this case and were found by law enforcement in Kansas. And there were records of other child protection investigations in Michigan and Florida.

¶ 24 Ultimately, the caseworker opined that the concerns that led to the case opening were "ongoing" and "chronic," and the parents were "without plan and efforts to address those issues."

¶ 25　From the above-described evidence, the jury could reasonably infer that the children were each dependent or neglected under one or more of the statutory criteria presented.  *See* § 19-3-102(1)(b)-(d). Accordingly, we will not disturb the jury's verdict.

### III.　Disposition

¶ 26　The judgment is affirmed.

JUDGE WELLING and JUDGE SCHOCK concur.