25CA2135 Peo in Interest of IC 05-14-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA2135
City and County of Denver Juvenile Court No. 25JV30395
Honorable Lisa Gomez, Judge

The People of the State of Colorado,

Appellee,

In the Interest of I.C., Z.C., D.C., T.C., M.C., E.C., and N.C., Children,

and Concerning R.O.B.J.C.,

Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Welling and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 14, 2026

Miko Brown, City Attorney, Christina R. Kinsella, Assistant City Attorney, Denver, Colorado, for Appellee

Debra W. Dodd, Counsel for Youth, Berthoud, Colorado, for I.C.

Debra W. Dodd, Guardian Ad Litem, for Z.C., D.C., T.C., M.C., E.C., and N.C.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant

¶ 1 R.C. (mother) appeals the judgment entered on a jury verdict adjudicating I.C., Z.C., D.C., T.C., M.C., E.C., and N.C. (the children) dependent or neglected. We affirm.

## I. Background

¶ 2 Denver Human Services (the Department) filed a petition in dependency or neglect based on concerns that the family was living in a van, that the older children were not enrolled in or attending school, and that the children were dirty and hungry. The seven children ranged in age from eighteen months to twelve years old.

¶ 3 Mother denied the allegations and requested an adjudicatory jury trial. After trial, the jury returned special verdicts finding that all seven children were dependent or neglected under section 19-3-102(1)(b)-(d), C.R.S. 2025. The jury unanimously found that (1) the children lacked proper parental care as a result of mother's acts or failures to act; (2) the children's environment was injurious to their welfare; and (3) mother failed or refused to provide the children proper or necessary subsistence, education, medical care, or any other care necessary for their health, guidance, or well-being.

## II. Indian Child Welfare Act (ICWA)

¶ 4　Mother first contends that the juvenile court has not complied with ICWA because the Department did not exercise due diligence to determine if the children are Indian children. We disagree.

### A. Applicable Law and Standard of Review

¶ 5　ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. ICWA applies to dependency and neglect proceedings involving Indian children. *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 2. Under ICWA, when the court "knows or has reason to know" that a child who is the subject of such a proceeding is an Indian child, the court must ensure that the Department "gives notice of the proceeding to any identified Indian tribes." *Id.* at ¶ 3 (quoting 25 U.S.C. § 1912(a)).

¶ 6　A mere assertion of a child's Indian heritage does not alone give the juvenile court reason to know that a child is an Indian child. *E.A.M.*, ¶ 56. But if the court receives information that the child may have Indian heritage, it must direct the Department to

2

"exercise due diligence in gathering additional information" that would assist the court in determining whether there is reason to know that the child is an Indian child. § 19-1.2-107(4)(a), C.R.S. 2025; *see H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶ 5.

¶ 7      We review de novo whether ICWA applies to a dependency and neglect case. *People in Interest of O.S-H.*, 2021 COA 130, ¶ 15.

### B.    Additional Background

¶ 8      Early in the case, the juvenile court ordered the parents to complete ICWA inquiry forms, relative information affidavits, and ICWA ancestry charts. The other parent, A.A., submitted a declaration denying any Native American or Alaska Native heritage.[1]

¶ 9      Mother alleged that she had "Cherokee, Blackwood [sic], and potentially Crow" heritage, but was "unaffiliated with the tribe formally." She told the court that she "need[ed] to look into her tribal heritage further," and would file "appropriate documents" with the court when she had done so. At a hearing approximately two weeks later, the Department asked about mother's claimed heritage and asked mother's counsel to assist in completing an

---

[1] A.A., formerly known as M.M.C., uses she/her pronouns. To avoid confusion, we refer to her as A.A.

3

ancestry chart. The Department told the court, and the court agreed, that at that point, ICWA was only "reason to investigate."

¶ 10    Seven weeks after the adjudicatory trial, the juvenile court entered an order finding that the case is not governed by ICWA based on the information then known. But it ordered mother to complete an ICWA ancestry chart, and it ordered the Department to continue to exercise due diligence in gathering additional information that would assist the court in determining whether there is reason to know that the children are Indian children.

¶ 11    The record does not contain any ICWA documents filed by mother or other information about mother's relatives.

### C.    Analysis

¶ 12    We agree with the district court that, based on the information in the record, there is no reason to know that the children are Indian children. Mother has never claimed that she or the children are members of an Indian tribe or that the children are eligible for membership in an Indian tribe. *See* 25 U.S.C. § 1903(4) (defining "Indian child"). And A.A. attested that she was not a member of an Indian tribe. Thus, at the time of the dispositional hearing, there

4

was no reason to know that the children were "the biological child[ren] of a member of an Indian tribe." 25 U.S.C. § 1903(4)(b).

¶ 13 To the extent mother asserts that the Department should have done more to gather information to make that determination, she did not provide the necessary information for it to do so, despite several court orders. If mother provides the requested information, there is a standing order requiring the Department to investigate.

¶ 14 Thus, based on the existing record, we conclude that the juvenile court complied with ICWA. *See E.A.M.,* ¶ 59 (holding that juvenile court complied with ICWA by directing department to exercise due diligence where mother's assertion of Indian heritage did not provide reason to know the child was an Indian child).

### III. Sufficiency of the Evidence

¶ 15 Mother also contends that the evidence was insufficient to support the jury verdict. We are not persuaded.

### A. Standard of Review and Applicable Law

¶ 16 In determining whether the evidence is sufficient to sustain an adjudication of dependency or neglect, we review the record in the light most favorable to the prevailing party and draw every inference "fairly deducible" from the evidence in favor of the jury's decision.

*People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

We may not disturb the jury verdict unless it is clearly erroneous,

meaning it lacks record support, "even though reasonable people

might arrive at different conclusions based on the same facts." *Id.*;

*see People in Interest of T.T.*, 128 P.3d 328, 331 (Colo. App. 2005).

¶ 17     The purpose of an adjudicatory hearing is to determine the

child's status as dependent or neglected under section 19-3-102

and whether that status warrants governmental intervention.

*People in Interest of N.G.*, 2012 COA 131, ¶ 39; *see also K.D. v.

People*, 139 P.3d 695, 699 (Colo. 2006) (noting that the adjudication

is not made as to the parents but relates only to the child's status).

¶ 18     As relevant in this case, a child is dependent or neglected if

(1) the child lacks proper parental care through the actions or

omissions of the parent; (2) the child's environment is injurious to

their welfare; or (3) a parent fails or refuses to provide the child with

proper or necessary subsistence, education, medical care, or any

other care necessary for their health, guidance, or well-being.

§ 19-3-102(1)(b)-(d).  Only one ground is required for an

adjudication.  *See People in Interest of S.M-L.*, 2016 COA 173, ¶ 29,

*aff'd on other grounds sub nom. People in Interest of R.S. v. G.S.*, 2018 CO 31.

¶ 19      An adjudication may be based on current, past, or prospective harm. *See People in Interest of G.E.S.*, 2016 COA 183, ¶ 15. When a child has been removed from the parents, the relevant inquiry is whether the child would be dependent or neglected if returned to the parents' care. *People in Interest of C.M.*, 2024 COA 90, ¶ 29.

¶ 20      An adjudication requires proof by a preponderance of the evidence that the child is dependent or neglected. *People in Interest of J.G.*, 2016 CO 39, ¶¶ 15, 53. This standard allows for some uncertainty in the determination of dispositive facts. *People in Interest of A.M.D.*, 648 P.2d 625, 634 (Colo. 1982). The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn therefrom, are within the jury's purview. *S.G.L.*, 214 P.3d at 583.

## B. Analysis

¶ 21      The evidence at the adjudicatory trial centered on the family's lack of housing and the children's lack of education and medical care. That evidence supports the jury's verdicts that the children lacked proper parental care, that they would be in an injurious

environment if returned to mother's care, and that mother failed to provide them with proper or necessary education or medical care.

¶ 22    First, multiple witnesses testified about the family's lack of stable housing. An intake caseworker testified about "the family's struggle with homelessness," including that the parents and seven children had "liv[ed] out of their van for around two years." A police officer testified that the van was "cramped or cluttered" and smelled like urine. The Department presented evidence that the children's clothes were dirty, wet, and smelled like urine. An intake caseworker testified that the children had chronic lice infections, that were "hard to eradicate due to the living conditions." And A.A. testified that the five youngest children were "stateless," that they had "no birth certificate[s], no social security number[s]," and that "there [was] no record of their existence anywhere on earth."

¶ 23    An intake caseworker testified that when the Department first became involved, the parents accepted help and "appeared to want to cooperate," but then "communication stopped and referrals continued to come in about the concerns and conditions of the [children]." Another intake caseworker testified that the parents

"actively tr[ied] to flee" the Department and were found in Kansas by law enforcement after the juvenile court issued bench warrants.

¶ 24    Second, the Department presented evidence to support its allegation of educational neglect. An intake caseworker testified that mother reported that she had homeschooled the children and that they had never attended a public school. But there was also testimony that none of the school-aged children, including the twelve-year old youth, could read or write. And the twelve-year-old youth struggled to name or recognize numbers above ten.

¶ 25    The ongoing caseworker worried about the children's educational needs because there were "many school-aged children who [were] not able to read or write or do basic math." The caseworker testified that he "heard that [the children] ha[d] been educated, but yet, [he saw] no evidence of that." When the caseworker scheduled a meeting with the parents to discuss the children's educational needs, they did not attend. And the director of a church who had provided support to the family testified that mother had no interest in enrolling the children in school.

¶ 26    Third, the jury heard testimony from medical professionals about the children's unmet medical needs. Early in the case, the

children were assessed at a medical clinic. A physician's assistant (PA) from the clinic testified that she did not know of any medical history for the children prior to the Department's involvement. Indeed, there was evidence that an earlier doctor's visit — which also occurred after the Department became involved — was the first time any of the children had been to a doctor's appointment.

¶ 27 The clinic's medical director, a doctor who was qualified as an expert in pediatric care, testified that she had concerns about the children's development, nutrition, and mental health. The three oldest children needed to be assessed to determine if they had a "language or learning issue or a neuropsychological issue or a developmental issue, like a learning disability, or whether that's a lack of exposure to [education]." The doctor opined that if the oldest child did not receive additional resources and support, she would not "be[] able to become an independent adolescent or adult."

¶ 28 The doctor also testified that some of the younger children did not exhibit "important social, emotional, developmental stages that are really critical for development." She opined that it would be "very important" for one of the children to have a specific medical diagnosis to determine whether she needed medication or would

10

qualify for services related to developmental concerns, such as speech therapy, occupational therapy, or learning accommodations.

¶ 29 The PA testified that the ten-year-old child "appeared to be delayed in her development" and that "there was concern about the three-year-old child's speech." And the nineteen-month-old child did not speak at all, even though a child that age generally "can be speaking somewhere between twenty to fifty words." The PA opined that some of the children "potentially medically have something that's keeping them from meeting those milestones or they haven't been given the education to meet those milestones."

¶ 30 Mother denied having any concerns about the children's development or behavior but testified that she "pick[ed] up on, like dyslexia and possibly dyscalculia" while teaching the oldest child. A.A. agreed that "most of [the older children's] issues lies [sic] in the dyslexia." But A.A. testified that the children's dyslexia was "going to have to be addressed in the lesson plans" and that the parents did not "have any documentation of any standardized test [or assessment] for the children."

¶ 31 Mother argues that she had addressed the Department's concerns because she and A.A. had obtained stable housing and

had a plan to meet the children's educational needs. But although the parents were living at a family shelter without the children at the time of trial, the family had previously been removed from that shelter because five of the children did not have birth certificates or social security numbers. A homeless rights activist who had worked with the family testified that whether the family had "overcome the barriers to housing" was "complex" because, while the parents were "indoors," the shelter was "not housing."

¶ 32 Moreover, the ongoing caseworker testified that he was concerned that the family would not remain at the shelter if the Department was not involved because the parents intended to go to California or South America. He explained that the parents "ha[d] demonstrated a history of leaving the state during child welfare involvement in the past and [he] worr[ied] about that pattern continuing." As noted above, the parents had fled Colorado with the children on the day of the shelter hearing in this case and were found by law enforcement in Kansas. And there were records of other child protection investigations in Michigan and Florida.

¶ 33 Regarding mother's stated plans to homeschool the children, the caseworker testified that the parents had "no concrete plans,

12

worksheets, or anything of the sort that would identify . . . a curriculum." Ultimately, the caseworker opined that the concerns that led to the case opening were "ongoing" and "chronic," and the parents were "without plan and efforts to address those issues."

¶ 34 Viewing this evidence in the light most favorable to the Department, the jury could reasonably infer that each of the children was dependent or neglected under one or more of the applicable statutory criteria. *See* § 19-3-102(1)(b)-(d); *S.G.L.*, 214 P.3d at 583. And to the extent mother testified that she planned to address the children's needs in the future, the jury did not need to credit that testimony. *See S.G.L.*, 214 P.3d at 583 (noting that witness credibility is a matter for the factfinder). Thus, because the record supports the jury's verdict, we will not disturb it. *See id.*

## IV. Disposition

¶ 35 The judgment is affirmed.

JUDGE WELLING and JUDGE LUM concur.