IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 2, 2021

## IN RE ISABELLA S., ET AL.

**Appeal from the Circuit Court for Williamson County**
**No. 2019-318     Michael Binkley, Judge**

_____

**No. M2020-00535-COA-R3-JV**

_____

This appeal concerns a disposition in a dependency and neglect case. Leslie S. ("Mother") is the mother of the subject minor children Isabella S., Macie S., and Gabriel S. ("the Children," collectively). The Children's maternal grandparents Sheila W. and Richard W. ("Grandparents") filed a petition for dependency and neglect in the Juvenile Court for Williamson County ("the Juvenile Court"). The Juvenile Court adjudicated the Children dependent and neglected. In the disposition phase, the Juvenile Court awarded Grandparents permanent guardianship of the Children, with Mother to exercise only supervised visitation. Mother appealed to the Circuit Court for Williamson County ("the Circuit Court"), which reached the same result. Mother now appeals to this Court, arguing that the Children should be returned to her custody or, alternatively, that her visits be unsupervised. The Circuit Court found, among other things, that Mother's fiancé Allen M. ("Fiancé") had engaged in sexually predatory behavior, and that Mother was in denial about the threat Fiancé posed to the Children. The evidence does not preponderate against that or the Circuit Court's other factual findings. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Raquel A. Abel and Jennifer Honeycutt, Franklin, Tennessee, for the appellant, Leslie S.

Sherry A. Elrod, Franklin, Tennessee, guardian ad litem.

S. Jason Whatley, Columbia, Tennessee, for the appellees, Sheila W. and Richard W.

Chad Cash, Franklin, Tennessee, for the appellee, Jose S.

# OPINION

## Background

In June 2018, Grandparents filed a petition in the Juvenile Court alleging that the Children were dependent and neglected. The Children were born of Mother and Jose S. ("Father"),[1] a resident of Texas. At the time the petition was filed, Father and Mother no longer were together, and Mother was seeing Fiancé. Mother and the Children lived in Grandparents' home for approximately five years leading up to Grandparents' petition. In August 2018, the Juvenile Court found the Children dependent and neglected based upon Mother's living with Fiancé, a man facing a number of criminal indictments including domestic violence, aggravated child abuse, child abuse to his biological children, and statutory rape and incest as to his biological daughter. The Juvenile Court also found that Mother lacked a stable home and that she could not financially provide for the Children. In June 2019, following a dispositional hearing, the Juvenile Court awarded Grandparents permanent guardianship of the Children. Mother was to have supervised visitation at Grandparents' discretion. Mother appealed to the Circuit Court seeking trial de novo. In September 2019, this case was tried de novo before the Circuit Court.

Fiancé testified first. Fiancé stated that he met Mother in 2018. Within approximately two weeks of meeting, he and Mother began living together. Fiancé testified that he had several children from previous relationships with multiple women. One of these children was Madison, a 14-year-old daughter. Fiancé testified that he had no visitation rights with three of his children, which was "part of having all the criminal cases dismissed." When asked how long he was banned from seeing these children, Fiancé stated: "I'm not positive. I don't have any intent to see the children ever again; so I'm not concerned with it." Fiancé testified that, as a result of the allegations against him, he feared for his freedom were he to go around these children again. Fiancé stated that the allegations against him were false.

Fiancé testified that he had resolved all of his criminal charges from Maury County. Madison was an alleged victim of Fiancé. Fiancé testified that between roughly 2010 and 2017, Madison had given him some five to ten sexually explicit writings. The writings involved Madison fantasizing about Fiancé, her father. Fiancé stated that he did not call any agency or doctor in response to his daughter's behavior. Fiancé testified he just told his then-wife, Stephanie M, about it. Fiancé stated: "I mean, I brought it up to my wife at the time because of it. She generally kind of handled all that… most of their appointments and medical stuff for a good bit of the time." Fiancé stated it was his view that Stephanie M. "programmed" Madison to lie and say Fiancé molested her. Father testified further that

---

[1] Isabella was born in 2010. Macie and Gabriel were born in 2014.

Madison had once grabbed his "crotch." In addition, Fiancé stated that he found Madison masturbating while calling his name. Asked to explain his failure to take any meaningful corrective action in response to his daughter's behavior, Fiancé testified: "It was mentioned time and again that I felt she had an Oedipus Complex, and I thought she needed mental help. No, I personally didn't do it, but, yes, I passed the buck. Do I regret passing the buck? Oh, yeah."

Fiancé was asked about his testimony from prior court proceedings where he stated that the crotch-grabbing incident was sexualized behavior, in contrast to his testimony before the Circuit Court that it was simply "playful." Fiancé stated:

> That was a testimony or statement I was making while incarcerated, under duress. I was attempting to think of anything at all that could help to prove my innocence. If -- so I was mentioning anything that could be construed remotely sexual and trying to get everything out there and get in front of it. I've got a bad habit of talking, I talk a lot, and -- yeah, I don't think anyone in here would doubt that.

When asked to clarify once and for all whether the crotch-grabbing incident was playful or sexual, Fiancé testified he did not know. Father also stated that he handed some of the sexually explicit writings he received from Madison back to her. Asked why, Fiancé testified: "[I]t was hers. I told her to get rid of it… I didn't write it." Regarding his criminal charges, Fiancé never was convicted on any charges pertaining to the sexual abuse of a child. However, Fiancé pled guilty to domestic assault and an amended charge of attempted statutory rape involving Stephane M. (albeit not on grounds that Stephanie M. was underage).

Fiancé testified that he intended to marry Mother within the next month after the hearing. Asked if he told Mother when they first met whether he had been charged with raping his daughter, Fiancé testified: "I don't really remember." Fiancé testified that Grandparents became very upset upon finding out about his charges. Fiancé stated that, notwithstanding that, Mother remained with him the entire time. In fact, Fiancé stated: "[Mother] was standing beside me 100 percent of the time." Regarding his future plans with Mother, Fiancé testified: "I intend to stay with the woman that I intend to marry and that I love and care about, yes." With respect to where he placed the blame for his past criminal charges, Fiancé stated: "I would place the blame either on the children or the women, especially in the instances where the women were identified by law enforcement as the perpetrator." Fiancé stated that he had no pending charges or court dates. Fiancé stated that if the court were to enter a no-contact order barring the Children from being around him during Mother's visits, he would not be willing to leave for a weekend or go to a hotel. Fiancé stated: "No. That would create undue hardship." Fiancé testified that

he had never had a child who did not accuse him of abuse in some form or another. Asked by the Trial Judge if he would be willing to undergo a psychosexual evaluation, Fiancé stated he would if the Department of Children's Services paid for it.

Next to testify was Tracy Steyer ("Steyer"), a licensed marriage and family therapist since 2003. The Circuit Court found Steyer qualified as an expert and accepted her credentialing and qualifications into evidence. Steyer had been asked by Grandparents' counsel to become involved in the case. Steyer conducted several interviews. Steyer met with Ethan and Emma, two of Mother's older offspring who are not subject to this appeal. Emma, age 15, was in the joint custody of her grandmother and Mother. Ethan was 18. Steyer also met with Isabella, age 8. Steyer sat in on Fiancé's testimony in Circuit Court, which she found "profoundly" clinically significant. Steyer testified that, years before, Mother had left Emma for some time in the home of a relative. Emma was abused in that home. Emma later went to live with Grandparents. Steyer testified that Mother had a history of drug addiction and prostitution. However, Steyer stated that Mother became sober and made improvements in her life. With respect to Ethan, Grandparents adopted him when he was six years old. Steyer testified that Ethan stated his Mother lacked any judgment and was more like a sister to him. Steyer testified to an incident described by Ethan in which Mother and Fiancé began to "make out" in front of him, Isabella, and a couple of Ethan's friends while they were playing video games. The friends found this "weird and creepy" and got up and left. Steyer stated that this was "oversexualized" behavior on Mother and Fiancé's part. Steyer then was asked about Emma again. Emma has cerebral palsy and is soft-spoken, according to Steyer. Steyer testified that Emma felt betrayed by Mother because Mother shared with Fiancé details of Emma's history of being a victim of sexual abuse. Emma felt like Mother's relationship with Fiancé constituted a second abandonment of her. Steyer stated that Emma believed Mother was not truthful. Emma reported that Mother called her "s--- head" and a "b----," and told her "I don't give a f--- how you feel."

Continuing her testimony, Steyer outlined the six stages of "grooming"—a type of predatory sexual behavior—and how it related to Fiancé. Steyer stated that the six stages were: (1) target, (2) trust, (3) fill a void or need, (4) isolate, (5) sexualize, and (6) control. In Steyer's opinion, Fiancé had reached the first five stages. Asked if it was clinically significant that Fiancé brought up the topic of sexual abuse in one of his first conversations with Emma, Steyer testified: "Worst-case scenario of this, it was grooming; best-case scenario of this, it is a complete and utter lack of boundaries; of appropriate boundaries between an adult and a child that you've just met." Steyer stated that Emma believed Fiancé was "testing the waters" with her. Steyer stated further that Emma reported Fiancé told her his daughter kept "sending him nudes." According to Emma, in another incident, Fiancé rubbed Mother's buttocks and breasts in front of her while they were in line at a show. Finally, Steyer discussed Isabella. Isabella, age 8, informed Steyer that Mother

stayed on her phone talking to Fiancé during visits. Asked who took care of her when she got hurt, Isabella said "Nanna or Pap." Steyer testified to her conclusions about the case:

> I think it's important for me to say that, you know, that I -- I think that it's -- history, when there is a pervasive and chronic pattern of compromised judgment, that has to matter in the present day. And while I recognize, as I mentioned a moment ago, that [Mother] has made some improvements -- I don't think there's any question about that; that she does not live the lifestyle that she once lived, that, you know, involved drug houses and prostitution and arrests and all those things, which is fantastic -- what has persisted is this extremely compromised judgment with respect to parental decisions.
>
> So [Fiancé] is case in point. You know, I'm aware, based on the testimony we heard here today, that [Fiancé] has not been convicted of any of the -- to our knowledge, hasn't been convicted of any of the charges. That has virtually no bearing whatsoever on my recommendation for this very simple reason -- and I said it in Judge Guffee's courtroom -- somehow, someway, the majority of us in this room have managed to navigate our entire lives without having one single indictment for sexual abuse of our own children; yet, that seems to be his chronic and pervasive issue that just doesn't go away.
>
> In hearing [Fiancé's] responses when he was questioned by whomever, it is so deeply disturbing to me that I heard and I jotted this note down as I was listening to it: This blame-the-victim mentality; it's somebody else's fault, it's an ex-wife's fault, or it's even the child's fault. And the testimony about Madison [M.], it sounds like he's blaming her that he was accused of these things. And this child, make no mistake, is a victim of something, end of story, and, whatever it is, it is not her fault, and when I heard that testimony, I found it so deeply disturbing.
>
> With respect to [Mother]; the mother, you know, I get that he has not been convicted. Most of us don't need someone like me or someone like Your Honor to say to them, "Yeah, this is just a bad idea to put your kids around this person.["] With or without a conviction, you know, this is kind of like sending your three-year-old into the street to play with their ball; you just don't do it. That's neglectful parenting. And I don't need anybody to tell me I don't want my children being around that person, conviction or no conviction.
>
> So, again, while I give her credit for some of the changes she's made in her life, now, I don't even know if she's aware of what are poor judgment calls with respect to parenting. She might not recognize them as that.

Steyer acknowledged that she had not interviewed Mother or Fiancé. Steyer testified: "I've been presented with a set of facts that I'm asked my opinion on, and that's what I'm giving." Steyer had five recommendations going forward. First, Steyer testified Mother should not exercise unsupervised visitation with the Children until she completed a psychosocial or psychosexual evaluation performed by a reputable clinical professional. Second, Steyer recommended that the Children have no contact whatsoever with Fiancé. Third, Steyer recommended continued therapy for the Children to address their emotional trauma. Fourth, Steyer recommended parenting therapy for Mother and that all of Mother's contact with the Children be clinically supervised and evaluated until the facts of the case changed. Finally, Steyer recommended "post-psychosocial and -sexual evaluations if deemed emotionally safe" for the Children following a protocol of parent/child interaction therapy. Steyer testified that she knew of no reason why the Children should not remain under the guardianship of Grandparents in the meantime. Steyer stated that Ethan, Emma, and Isabella never wavered in their statements to her, and she believed them.

Mother testified next. Mother stated that she met Fiancé online. Mother testified that she had observed no inappropriate behaviors from Fiancé. Mother stated:

I have never felt a negative vibe, I have never seen any reason to be concerned. The more I have gotten to know him; the more I've gotten to be around other people that know him; the more that I've had confrontations with his ex-wife; you know, the more I've -- still, I have absolutely no doubt in my mind that, you know, he is -- he's not the monster that they want to make him out to be.

Mother testified that she visited the Children for two to three hours at a time, usually once per week. Mother stated that the Children hug her and tell her they love her. Mother disputed Steyer's testimony that she did not pay attention to the Children on her visits. Mother stated that she understood Emma's resentment toward her and that she has attended counseling with her. Mother testified that the counseling stopped because Emma would not talk to anybody. Mother testified that previously, with her parents' agreement, she had Emma admitted to an in-patient facility for "lying" and "sexual behavior" stemming from Emma's internet usage. Mother denied Emma's account that Fiancé groped her in front of Emma. Mother also denied Ethan's account that she made out with Fiancé in front of him and his friends. Mother testified further that she never joked about sex in front of the Children. Mother stated that, despite a court order, Grandparents had on at least one occasion let her take Isabella to McDonald's unsupervised.

Mother testified to certain tasks she completed such as parenting classes and a mental health assessment. Mother stated that she was not opposed to undergoing a psychosexual evaluation, but that she would need assistance in setting one up. Mother

stated that she would abide by a court order barring the Children from being around Fiancé. However, Mother stated: "Honestly, I think after the [psychosexual] evaluations are done, I don't think they're going to, you know, find any reason that, you know, anything in our household is unsafe." Mother acknowledged that neither she nor Fiancé had undergone a psychosexual evaluation to date.

On cross-examination, Mother was asked how she could trust Fiancé so deeply so soon after meeting him. Mother stated: "I made my decisions based on my instincts. I had been around him with my kids a lot. I never once had any concerns whatsoever. I then -- like I said, even after sitting through the trials, even after the past year, my decision has not changed." Mother testified that she believed Emma had been coached to tell Steyer certain things. Mother testified that she believed Fiancé's children had been coached to make allegations against him, as well. Mother acknowledged that she was financially dependent on Fiancé. Asked again if she had any concerns about Fiancé, Mother testified: "I think he's innocent." Mother stated that she had not completed a psychosexual evaluation because the Department of Children's Services had failed to set one up.

Sheila W., the Children's grandmother, testified that she and her husband wanted permanent guardianship of the Children, and that they had no reservations about their ability to care for the Children. Emma also lived in Grandparents' home. Richard W., Sheila W.'s husband, took the stand briefly and testified that he agreed with his wife.

Father testified next. Father testified that he wanted Grandparents to be awarded permanent guardianship of the Children. Father supported only supervised visitation for Mother at this point. Father agreed that Fiancé should be barred from seeing the Children at all.

Morgan M., a friend of Mother's since 2014, took the stand. Morgan M. testified that, on two occasions since the petition was filed, she had observed Mother visit with the Children and the Children interacted very well with Mother. Morgan M. stated that, in May/June of 2018, she saw Fiancé around the Children and he did nothing inappropriate. Morgan M. stated that she had no concerns about either Fiancé or Mother. On cross-examination, Morgan M. testified that she believed Fiancé had been falsely accused.

The final witness to testify was Chris M., Fiancé's mother. Chris M. testified that Fiancé was "very good" with his children—picking them up from school, feeding them dinner, getting their schoolwork done, and getting them to bed. Chris M. stated that she never saw Fiancé abuse any of his children. However, Chris M. testified she had not seen her grandchildren in a couple of years. Chris M. explained: "I'm afraid to be close to them anymore, for the accusations that were involved. They can turn around and do it on me or my family, and I just don't trust right now."

In March 2020, the Circuit Court entered its Memorandum and Order. The Circuit Court found, in part:

74. [Fiancé], through his testimony, clearly demonstrates he should never be left alone with minor children.
75. [Fiancé] is not a credible witness.
76. [Fiancé] has failed to take responsibility for his own actions or failures to act and has demonstrated total lack of empathy for his own biological children.

***

145. Based upon Mother's testimony, her demeanor while testifying, as well as other indictors of credibility, the Court finds through Mother's "instincts," she formed an opinion of [Fiancé] which left no room for logic or facts.
146. There was clear proof indicating [Fiancé's] conduct as a sexual predator, but Mother would disregard any of the evidence against her boyfriend, even admissions of guilt in criminal cases, and, also, agree to sacrifice time with her own children in order to stay with [Fiancé].
147. The Court finds it unbelievable Mother has no concerns regarding [Fiancé's] conduct.
148. Mother refuses to believe her parents, the Maternal Grandparents, or the clear facts in this case, including the testimony of Ms. Steyer, with whom this Court gives great weight to her opinions and testimony.
149. The Court believed [Fiancé] and Mother seem to be totally detached from the reality of the facts and the testimony of the witnesses in this case at the hearings.

The Circuit Court found, by clear and convincing evidence, that the Children were dependent and neglected as of the date of the hearing in accordance with Tenn. Code Ann. § 37-1-102(b)(13)(B), (F), and (G).[2] However, the Circuit Court explicitly found that the Children had not been subjected to severe child abuse. As for the dispositional element of the proceedings, the Circuit Court awarded Grandparents permanent guardianship of the Children, finding Grandparents were best suited for the Children's protection and physical, mental, and moral welfare, in accordance with their best interest and in reference to the

---

[2] Tenn. Code Ann. § 37-1-102 provides, as relevant: "(13) "Dependent and neglected child" means a child: … (B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child; … (F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others; (G) Who is suffering from abuse or neglect[.]" Tenn. Code Ann. § 37-1-102 (Supp. 2020).

factors guiding custody determinations found at Tenn. Code Ann. § 36-6-106. In addition, the Circuit Court's order essentially adopted Steyer's recommendations: Mother would exercise supervised visitation only; Mother was to undergo psychosocial and psychosexual evaluations; the Children were to have absolutely no contact with Fiancé; the Children were to engage in therapy; Mother was to engage in parenting therapy; and, after Mother's evaluations, post-psychosocial and psychosexual evaluations for her and the Children. Mother timely appealed to this Court.

## Discussion

We restate and consolidate the two issues Mother raises on appeal into the following single, dispositive issue: whether the Circuit Court erred in awarding Grandparents permanent guardianship of the Children, or, alternatively, in declining to permit Mother unsupervised visitation with the Children.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ——— U.S. ———, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). Tenn. Code Ann. § 37-1-130 provides:

> (a) If the child is found to be dependent or neglected, the court may make any of the following orders of disposition best suited to the protection and physical, mental and moral welfare of the child:
> (1) Subject to the restrictions of § 37-1-129(c), permit the child to remain with the child's parents, guardian or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child;
> (2) Subject to the restrictions of § 37-1-129(c), and subject to conditions and limitations as the court prescribes, transfer temporary legal custody to or grant permanent guardianship in accordance with part 8 of this chapter to any of the following:
> (A) Any individual who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child; …

Tenn. Code Ann. § 37-1-130 (Supp. 2020). Here, the Juvenile Court, and later the Circuit Court upon a trial de novo, awarded Grandparents permanent guardianship of the Children pursuant to Tenn. Code Ann. § 37-1-801 (2014), which provides:

> The juvenile courts of Tennessee are empowered to appoint an individual a permanent guardian; provided, that the individual qualifies under the provisions of this part. The juvenile court may establish a permanent guardianship at a permanency planning hearing or at any other hearing in which a permanent legal disposition of the child can be made, including a child protection proceeding or a delinquency proceeding.

Mother contends that the applicable standard is that of clear and convincing evidence. For adjudications of dependency and neglect, that is correct. *See In re Tamera W.*, 515 S.W.3d 860, 869 n. 7 (Tenn. Ct. App. 2016) (finding the clear and convincing standard applicable to dependency and neglect adjudications). However, Mother does not challenge the Circuit Court's adjudicatory finding of dependency and neglect. Instead, Mother challenges only the disposition. Rule 308(e) of the Tennessee Rules of Juvenile Practice and Procedure states: "The standard of proof at the dispositional hearing is preponderance of the evidence." We further note Rule 101(b), which provides: "These rules apply to delinquent, unruly, and dependent and neglect proceedings." This Court has discussed the application of the preponderance of the evidence standard in the context of dispositions ordered upon a finding of dependency and neglect as follows:

Mother argues that the divestment of custody to the child's aunt, when Mother was in compliance with the terms of the parenting plan, constitutes de facto termination of Mother's parental rights. We cannot agree.

Dependency and neglect proceedings and proceedings to terminate parental rights have distinct purposes. In a dependency and neglect action, the primary purpose is to "provide for the care and protection of children whose parents are unable or unwilling to do so." *State v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006) (citing *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004)). The purpose of termination proceedings is "to irrevocably sever the legal relationship between parent and child." *Id.*

In this case, the court granted DCS's motion to divest custody to Joyce A., thereby making her Gina's legal custodian. Tenn. Code Ann. § 37-1-130(a)(2)(D) permits a court, after adjudicating a child dependent and neglected,[3] to transfer temporary legal custody or grant permanent guardianship to "[a]n individual in another state with or without supervision" if such a placement is in the child's best interests. The rights and duties of a child's legal custodian remain subject to the remaining rights and duties of the child's parents. *See* Tenn. Code Ann. §§ 37-1-140(a), 37-5-103(12); Tenn. R. Juv. P. 2(10). Pursuant to Tenn. Code Ann. § 37-1-803(a), an order of permanent guardianship "does not terminate the parent and child relationship," including the following rights:

> (1) The rights of the child to inherit from the child's parents;
> (2) The parents' right to visit or contact the child, as defined by the court;
> (3) The parents' right to consent to the child's adoption; and
> (4) The parents' responsibility to provide financial, medical, and other support for the child.

Moreover, Mother retains the right to petition to regain custody of Gina.

Courts in other jurisdictions have considered constitutional challenges to statutes allowing permanent guardianship of a child adjudicated to be dependent and neglected under a preponderance of the evidence standard. *See In re A.G.*, 900 A.2d 677, 680 (D.C. Ct. App. 2006); *In re R.W.*, 10 P.3d 1271, 1276 (Colo. 2000); *In re Dependency of F.S.*, 913 P.2d 844, 846-47 (Wash. Ct. App. 1996). These courts have ruled that "for statutes terminating

---

[3] Mother does not dispute the trial court's finding that Gina was dependent and neglected.

only some of a parent's rights to his or her child, the preponderance of the evidence standard does not violate the Constitution's due process requirements." *In re A.G.*, 900 A.2d at 680. As outlined above, the transfer of legal custody or the creation of a permanent guardianship does not end the parent-child relationship. *See* Tenn. Code Ann. §§ 37-1-140(a), 37-1-803(a); *In re A.G.*, 900 A.2d at 680. Furthermore, the Tennessee statute requires a finding of dependency and neglect to be made based upon a clear and convincing evidence standard. Tenn. Code Ann. § 37-1-129.

*In re Gina A.*, No. M2011-00956-COA-R3-JV, 2012 WL 1388378, at *5 (Tenn. Ct. App. April 19, 2012), *no appl. perm. appeal filed* (footnote in original but renumbered).

Our review of the law persuades us that the correct standard for the dispositional phase of a dependency and neglect proceeding is that of a preponderance of the evidence rather than the clear and convincing standard applied in the initial adjudication of dependency and neglect. We therefore proceed on that basis.

In her brief, Mother makes several arguments as to why custody of the Children should be restored to her or that she should at least receive unsupervised visitation: (1) Steyer's report was flawed in that Steyer never interviewed Mother or Fiancé and relied heavily on interviews with Emma and Ethan who hold negative views about Mother; (2) Fiancé never was convicted of sex crimes against children and any allegations against him stemmed from contentious relationships with the mothers involved; and, (3) the Circuit Court's disposition was not in the Children's best interest because it does not allow them to maintain a meaningful relationship with Mother.

Taking Mother's arguments in turn, we first address Steyer's report and testimony. While Mother is correct that Steyer never interviewed Mother or Fiancé, Steyer did sit in on Fiancé's testimony in the Circuit Court before testifying herself. Steyer stated that Fiancé's testimony was of profound clinical significance. With respect to Mother's assertion that Emma and Ethan's accounts should be viewed in the context of their negative experiences with Mother, we find no reason to believe that Steyer failed to account for this in rendering her report or testimony. Steyer, a licensed marriage and family therapist qualified as an expert witness, testified that she believed Emma and Ethan. We see nothing in Steyer's methods that would somehow negate the weight afforded her report and testimony by the Circuit Court. We also note that there was no competing expert to contradict Steyer. What is more, even if one were to discount Steyer's report and testimony completely, the Circuit Court heard the testimony of Mother and Fiancé themselves and found them utterly lacking in credibility.

Next, Mother points out that Fiancé never was convicted of sex crimes against children. Mother suggests that Fiancé's accusers were somehow coached or otherwise predisposed against him. First, this is a civil rather than a criminal matter; the standard is not that of beyond a reasonable doubt. Fiancé is not on trial here. The issue is the Circuit Court's disposition for the Children in this dependency and neglect case. If the Children were returned to Mother's custody, or she were to receive unsupervised visitation, they would almost certainly come into contact with Fiancé given that he and Mother planned to get married and live together. Whether Fiancé is an appropriate figure to be in the Children's lives is a completely legitimate factor in rendering an appropriate disposition for these dependent and neglected children. By Fiancé's own account, his young daughter expressed sexual feelings toward him and he did nothing to get help for her. In fact, amazingly, Fiancé returned some of his daughter's sexually explicit writings about him to her. Additionally, Steyer testified that Fiancé engaged in certain of the steps of grooming in his conduct toward Emma. The Circuit Court rejected Fiancé's fanciful explanations. There is nothing in this record that would serve to overturn the Circuit Court's credibility determinations. All in all, Fiancé was a non-credible witness, and the evidence at trial fully supports the Circuit Court's conclusion that he would represent a threat to the Children should he have an opportunity to be around them.

As a final argument, Mother contends that restricting her visitation with the Children to the degree ordered by the Circuit Court is not in the Children's best interest. Mother asserts that she has done all that has been asked of her. Mother states, for instance, she has obtained stable housing and employment. Mother states further that the Children love her and should be able to form a closer bond with her. We agree that the evidence reflects Mother has made improvements in her life in recent years. However, the question before us is not about whether Mother has made improvements or her love for the Children; the question is about Mother's judgment as a parent. While Mother has taken certain steps, she had not undergone a psychosexual evaluation as of the date of the hearing. Most critically, Mother has not addressed the elephant in the room—the impact of her relationship with Fiancé on her ability to safely parent the Children. The Circuit Court found, among other things, that Mother ignores the risk to the Children posed by Fiancé. The evidence does not preponderate against this or the Circuit Court's other factual findings. Meanwhile, Mother does not even attempt to argue that Grandparents are unsuitable caregivers for the Children. Based upon our careful review of the record, we find that the Circuit Court did not err in awarding Grandparents permanent guardianship of the Children on the basis that this arrangement is best suited to the Children's protection as well as their physical, mental, and moral welfare, and is in the Children's best interest. We further find that the Circuit Court did not err in declining at this time to grant Mother

unsupervised visitation with the Children.[4]  We affirm the judgment of the Circuit Court in its entirety.

## **Conclusion**

The judgment of the Circuit Court is affirmed, and this cause is remanded to the Circuit Court for collection of the costs below.  The costs on appeal are assessed against the Appellant, Leslie S., and her surety, if any.

s/ D. Michael Swiney\
D. MICHAEL SWINEY, CHIEF JUDGE

---

[4] Even if we err in our determination that the preponderance of the evidence standard applies to this disposition and the correct standard is clear and convincing evidence, the record is such that, in our judgment, the outcome would be the same under the clear and convincing standard as well.  We have no serious or substantial doubt about the correctness of the conclusions drawn from the evidence in this case.